J-A17018-21

2021 PA Super 197

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ALFONSO SANCHEZ | : | |
| | : | |
| Appellant | : | No. 2073 EDA 2020 |

Appeal from the Order Entered October 2, 2020
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0001136-2008

BEFORE: McLAUGHLIN, J., KING, J., and PELLEGRINI, J.[*]

OPINION BY KING, J.:                    **FILED OCTOBER 4, 2021**

Appellant, Alfonso Sanchez, appeals from the order entered in the Bucks County Court of Common Pleas, which denied his second motion to dismiss the charges against him based on double jeopardy grounds.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On September 30, 2008, a jury convicted Appellant of two counts of first-degree murder and numerous other offenses in connection with the shooting deaths

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This interlocutory appeal is properly before us pursuant to Pa.R.Crim.P. 587(B)(6) (stating if judge denied motion to dismiss but does not find it frivolous, judge shall advise defendant on record that denial is immediately appealable as collateral order).  Here, the trial court expressly decided that Appellant's current motion to dismiss was not frivolous.  (**See** N.T. Hearing, 10/2/20, at 80-81).

of Mendez Thomas and Lisa Diaz.[2]  The case was tried as a capital case, so it proceeded to a penalty hearing on October 2, 2008, at which time the jury sentenced Appellant to death for the shooting of Lisa Diaz and a consecutive life sentence for the shooting of Mendez Thomas.  The court imposed the death sentence on October 22, 2008.  Our Supreme Court affirmed the judgment of sentence on December 17, 2013, and the United States Supreme Court denied *certiorari* on October 6, 2014.  *See Commonwealth v. Sanchez*, 623 Pa. 253, 82 A.3d 943 (2013), *cert. denied*, 574 U.S. 860, 135 S.Ct. 154, 190 L.Ed.2d 113 (2014).

On January 30, 2015, Appellant timely filed a petition pursuant to the Post Conviction Relief Act ("PCRA") at 42 Pa.C.S.A. §§ 9541-9546.  During the PCRA proceedings, the Commonwealth disclosed that it was in receipt of a DNA lab analysis dated October 23, 2008, that it had not turned over to the defense before or during trial.  The lab report concerned DNA found under victim Lisa Diaz's fingernail clippings, which matched the DNA of Appellant's co-defendant, Steven Miranda.[3]

Based on this new evidence, and with the agreement of the Commonwealth, the court entered an order on January 26, 2017, vacating

---

[2] Appellant committed the offenses with his co-conspirators Steven Miranda and Alex Martinez.

[3] Steven Miranda was tried with Appellant, and the jury also convicted him of first-degree murder.

Appellant's judgment of sentence and ordering a new trial.

On February 14, 2017, Appellant filed a *pro se* motion to dismiss based on double jeopardy grounds. In the motion, Appellant alleged, *inter alia*: (1) the Commonwealth intentionally suppressed the DNA analysis; (2) the prosecutor knew or should have known that multiple pieces of physical evidence, including the murder weapon and Lisa Diaz's fingernail clippings, had been submitted for DNA analysis; (3) the presence of Steven Miranda's DNA under Lisa Diaz's fingernails inculpated him, as it suggested that Lisa Diaz scratched Steven Miranda to defend herself against him; and (4) the Commonwealth proffered false evidence at trial when one of its witnesses stated that the murder weapon had not been submitted for DNA testing.

The court subsequently appointed new counsel for Appellant for the upcoming re-trial, which was scheduled for October 10, 2017. On October 10, 2017, the parties appeared for jury selection. Appellant's counsel "adopted" the *pro se* double jeopardy motion and the court held a hearing on the motion on October 10th and 11th, 2017. This Court has summarized the relevant testimony from those hearings as follows:

> The document at issue was formally introduced as the report from the Pennsylvania State Police [("PSP")] Bureau of Forensic Services, DNA Laboratory in Greensburg, Pennsylvania, dated October 23, 2008.[4] **See** N.T., 10/10/17, at 79-80. Pertinently, [the trial prosecutor] Mr. Gambardella [(who is now a District Judge)] testified that

---

[4] The evidence was sent from the PSP lab in Bethlehem to the PSP lab in Greensburg for analysis.

- 3 -

he did not "recall directing" the taking and submission of DNA testing, and it was "something that the detectives could decide to do on their own." *Id.* at 78. Further, it was not until after trial that Bucks County Detective McDonough told him that the detective had received "a report, I believe from Warminster [Township], involving DNA analysis, but that's my recollection. That was after the verdict, well after verdict." *Id.* at 79. Mr. Gambardella testified that he immediately forwarded the report to Appellant's [trial] counsel, Mr. McMahon. *Id.* at 80, 82, 84, 93. Mr. Gambardella stated:

> I didn't make a judgment at the time. I think it's for Mr. McMahon to do, to make a judgment as to what value the evidence might have had, if any, but it was an analysis that came in involving the case and involving one of the co-defendants who was present at the scene, even though he had a relationship, or that's my recollection, with the victim, but because it was material to the facts involving a co-defendant, I immediately turned it over.... [A]gain, it was something that involved the case. Whether it involved [Appellant] or not, [Appellant] or [his co-defendant], because it involved one of the defendants, I determined, as I would for anything of this nature, that it should be turned over.

N.T., 10/10/17, at 96.

When asked whether he had intentionally withheld evidence, Mr. Gambardella replied, "[n]o, never." *Id.* at 97. He also testified that he did not know of any detectives or police intentionally withholding evidence. *Id.*

Warminster Township Police Detective John Bonargo testified to working with the Bucks County District Attorney's office and taking the fingernail evidence to the [PSP] for analysis in November of 2007. N.T., 10/11/17, at 9, 18. At the time, Detective Bonargo listed his name on the submission form as the "point of contact." *Id.* at 10. However, he stated that he "didn't have any personal conversations" with the lead investigator, Detective Harold, about the evidence, and opined that he "should have." *Id.* at 20. It was not until 2008 when PSP contacted Detective

Bonargo about the fingernail clippings. *Id.* The detective testified that he received the DNA analysis "post conviction." *Id.* at 22. He did not recall being asked by anyone prior to trial about the DNA testing occurring. *Id.* at 23. He explained that when he went to the lab and retrieved the report he:

> [r]eturned to headquarters, put those items in evidence, and placed the serology report on my Sergeant's desk, which in hindsight, I should have notified the affiant [Detective Harold] in the case right away so they would know immediately those items were back.

N.T., 10/10/17, at 12.

Appellant's trial counsel, Mr. McMahon, testified on Appellant's behalf. He stated:

> I think I asked [the assistant district attorney, Mr. Gambardella,] prior to trial. I asked him twice during the trial, or during the jury selection process, because just after all my experience trying homicide cases, there is no way that the Pennsylvania State Police clipped those [finger]nails and then did nothing with them.

N.T., 10/11/17, at 131-132.

He continued:

> [T]he first time I asked him was on the telephone. He said he didn't know. He did not – he just wasn't sure, and I said check into it. Then he told me that they were – that no testing was done. Then when we came back here again I said, look, you got to go check again, and he told me that he called the Pennsylvania State Police, because I said to him, Gary, come on, man, there's no way, and he said he called the Pennsylvania State Police and they said they did not analyze those forensically in any way, shape, or form, and I said that's nonsense. I said to him you've got to talk to somebody else because that's just, I don't know who you spoke to, but whoever you spoke to is

not giving you the right information.  He talked to me the next day and said he spoke – I said you got to speak to a supervisor or somebody, and he came back and said, Jack, they did not test those items, I double checked.

*Id.* at 132-133.  Mr. McMahon stated that he had a "hundred percent clear recollection" that was "crystal clear."  *Id.* at 133.  He averred that the fingernail evidence was "very, very significant" and "key to the defense" because his theory was that Appellant's co-defendant, Steven Miranda – not Appellant – was the shooter and would have left DNA evidence under the victim's fingernails.  *Id.* at 137-138.  He explained:

[The evidence] would have demonstrated and assisted me in that theory that I tried to, if you read the trial [transcript] you'll see that I tried to present a pretty, [vociferously] that [Steven] Miranda was the actor, the major player.  He was the one that was doing all the things.  This [DNA] report here would have been extremely helpful and back that up.  I should have had it.

*Id.* at 142.

However, on rebuttal, Mr. Gambardella testified to the contrary.  He stated:

There were very few conversations either in person or over the phone with Mr. McMahon, because largely, because he was so hard to get a hold of.  I had no conversation with him at the preliminary hearing because he failed to appear for the preliminary hearing.  I had very, what I will call, I would have difficulties getting a hold of him.  There was, at one point, I know of at least one letter that I sent him.  I reduced a lot of my correspondence to writing to make sure that the messages were getting across.

N.T., 10/11/17, at 150-151.

With regard to the fingernail clippings, Mr. Gambardella stated that he "did not have a recollection of [Mr. McMahon]

- 6 -

ever mentioning fingernail clippings, ever." *Id.* at 159. Further, Mr. Gambardella opined that if he had such evidence, he would have viewed it as favorable to the Commonwealth because it corroborated the witnesses who testified that Appellant's co-defendant, Steven Miranda, and the victim, Lisa Diaz "had a relationship." *Id.* at 159. In sum, Mr. Gambardella testified, "I never contacted the police regarding DNA analysis because I didn't know there was DNA analysis." *Id.* at 164.

Warminster Police Detective Sean Harold offered testimony similar to that of Mr. Gambardella. Detective Harold stated that in October of 2007, he was the "lead investigator" in the case against Appellant. *Id.* at 174. Detective Harold testified that he was unaware of any evidence taken by Detective Bonargo to the PSP lab for testing. *Id.* at 175. He specifically did not recall fingernail clippings being recovered from Lisa Diaz. *Id.* at 176. Detective Harold repeatedly testified to his belief that "back in 2008 that no evidence in this case had been sent for DNA testing." *Id.* at 178. He did not learn about the evidence that had been submitted to the lab until April of 2016, and opined that he "absolutely [did] not" intentionally withhold evidence in this case. *Id.* at 178-179. Detective Harold did not know who "took the initiative" and was responsible for sending the fingernail clippings to the PSP lab, and in fact was not aware that the clippings had even been taken. *Id.* at 180-182.

Similarly, Bucks County Detective Martin McDonough testified to investigating the case in conjunction with the Warminster Township Police, and having no knowledge of fingernail clippings taken from Lisa Diaz and sent to the PSP for DNA analysis. *Id.* at 185-186. He did not learn about the evidence until after Appellant's trial in October of 2008. *Id.* at 186. Detective McDonough learned about the evidence from Detective Bonargo. He stated:

> I believe Detective Bonargo faxed [the DNA report] to me. We had a phone conversation. He said, he had – we had a conversation, I believe it was over the phone, that he had this report from PSP, a DNA report from PSP. And I said, well, send it to me so I can give it to [Mr. Gambardella]. The trial is over, so we can forward it to Mr. McMahon. When I got my copy I

- 7 -

made a copy, handed it to Mr. Gambardella in the District Attorney's Office, and I put a copy I had in my file.

*Id.* at 192. Detective McDonough expressed his surprise at learning about the evidence. He continued:

I said to John [Bonargo], how did it get there? He said he dropped them off and they were being worked on. I said, John, we didn't even know they were at the lab. How did this happen? He really didn't have an answer.

*Id.* at 193.

After hearing argument from the parties, the trial court denied Appellant's motion to dismiss. The trial court verbally detailed the parties' respective arguments, recounted the testimony, and articulated its rationale for denying Appellant's motion. *See*, N.T., 10/11/17, at 219-228.

*Commonwealth v. Sanchez*, No. 3368 EDA 2017, unpublished memorandum at 9-14 (Pa.Super. filed June 28, 2018) (internal footnote omitted), *cert. denied*, ___ U.S. ___, 140 S.Ct. 445, 205 L.Ed.2d 257 (2019).

On appeal, this Court affirmed the trial court's denial of Appellant's motion to dismiss. In doing so, this Court decided there was no evidence that the police or prosecutor had intended to deprive Appellant of a fair trial. While this Court acknowledged there was a "miscommunication between the police, the prosecutor and the defense," this Court held that there was no intentional withholding of evidence which would rise to the level of prosecutorial

misconduct to bar retrial on double jeopardy grounds.[5] (*See id.* at 16-17).

On June 5, 2020, Appellant filed the current motion to dismiss on double jeopardy grounds, relying on the Supreme Court's decision in ***Commonwealth v. Johnson***, ___ Pa. ___, 231 A.3d 807 (2020). Appellant alleged that in ***Johnson***, the Supreme Court barred retrial on double jeopardy grounds where the prosecution's **reckless** actions prejudiced the defendant to the point of the denial of a fair trial. Consequently, Appellant claimed that even if the prosecution's actions in his case were unintentional, under ***Johnson***, the prosecution's reckless actions in failing to disclose the DNA results in his case deprived him of a fair trial such that retrying him would violate double jeopardy.

The court held a hearing on Appellant's motion on October 2, 2020.[6] At the conclusion of the hearing, the court denied relief. Appellant timely filed a notice of appeal on October 15, 2020. Appellant filed a voluntary concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on December 15, 2020.

Appellant raises one issue for our review:

> Did the Commonwealth act with recklessness and with deliberate indifference during the investigation and

---

[5] Our Supreme Court denied allowance of appeal on February 26, 2019, and the United States Supreme Court denied *certiorari* on October 21, 2019.

[6] The court incorporated the notes of testimony from the October 10th and 11th 2017 hearings, and the attorneys made argument on the applicability of ***Johnson*** to Appellant's case.

prosecution of [Appellant] sufficient to bar retrial on double jeopardy grounds?

(Appellant's Brief at 4).

Our standard and scope of review in this case are as follows:

An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*[.] To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings[.]

Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa.Super. 2015), *appeal denied*, 633 Pa. 775, 126 A.3d 1282 (2015) (quoting *Commonwealth v. Kearns*, 70 A.3d 881, 884 (Pa.Super. 2013), *appeal denied*, 624 Pa. 663, 84 A.3d 1063 (2014)).

Appellant argues the Commonwealth acted recklessly in this case due to its (1) oversight of forensic testing; and (2) failure to advise defense counsel of the exculpatory DNA analysis report after Appellant was sentenced to death. Regarding the oversight of forensic testing, Appellant challenges the Commonwealth's statement that its error in failing to disclose the DNA evidence was caused by a "failure to communicate" which resulted in the "collective ignorance" of the prosecution team. (Appellant's Brief at 26).

Rather, Appellant insists the Commonwealth's actions demonstrate that it acted recklessly and with deliberate indifference when investigating and prosecuting Appellant's case. Appellant emphasizes testimony at the 2017 double jeopardy hearing from Detective Bonargo, who testified that he took physical evidence, including the right-hand fingernail clippings of Lisa Diaz to the PSP Bethlehem lab for forensic testing on November 28, 2007. Appellant maintains Detective Bonargo also transported blood samples of Lisa Diaz and Mendez Thomas to the Bethlehem lab on January 10, 2008. Appellant avers that Detective Bonargo received a serology report on September 4, 2008 (four days prior to jury selection in Appellant's trial), which stated that the fingernail clippings of Lisa Diaz were forwarded to the PSP Greensburg DNA lab on August 13, 2008. Nevertheless, Detective Bonargo failed to notify the other police officers involved in the case or the prosecutor of the serology report. Following Appellant's convictions and death sentence, Detective Bonargo admitted that he received a DNA analysis from the PSP Greensburg lab.

Although the other police officers and the prosecutor testified consistently with Detective Bonargo that they were unaware Detective Bonargo had submitted evidence for forensic testing at any time prior to or during trial, Appellant submits the testimony from these witnesses is not credible and unsupported by the record. Appellant suggests "[i]t is hard to believe that an experienced prosecutor and several experienced detectives would have acted in such a manner when investigating and prosecuting a

capital homicide involving two victims." (*Id.* at 30). Specifically, Appellant highlights a telephone log entry from March 11, 2008, stating that the Bethlehem lab "gave results to Bonargo and explained which samples to DNA + why. Requested DNA samples from all suspects and living victim." (*Id.* at 30) (quoting Ex. CP-2). Appellant also emphasizes that Detective Bonargo brought the victims' blood samples to the lab. Appellant submits that the record belies Detective Bonargo's testimony that he did not think the lab would conduct an analysis unless and until Detective Bonargo expressly requested the lab to do so.

Appellant posits that testimony from the Commonwealth's witnesses regarding their oversight of forensic testing is simply not credible. Even if credible, Appellant insists the record shows the Commonwealth made a series of easily preventable mistakes regarding the oversight of evidence for forensic testing,[7] which cumulatively rise above ordinary negligence and amount to

---

[7] Specifically, Appellant highlights: (1) Detective Bonargo's failure to notify the other officers or prosecutor at any point prior to trial that he had taken evidence to the PSP Bethlehem lab for testing; (2) Detective Bonargo's failure to adequately review the serology report, which would have revealed ongoing DNA analysis; (3) Detective Bonargo's failure to notify the other police officers or prosecutor that the serology report indicated the presence of blood on the right-hand fingernails of Lisa Diaz; (4) Detective Bonargo's decision to leave a copy of the serology report on his supervisor's desk without ensuring that the other officers and prosecutor also received a copy of the report; (5) Detective Bonargo's incorrect assumption that the PSP Greensburg lab would contact him prior to conducting any DNA testing; (6) Detective Bonargo's incorrect assumption that the other officers and prosecutor would review his supplemental police reports prior to trial to learn of the serology report; (7)
*(Footnote Continued Next Page)*

- 12 -

recklessness.

With respect to the Commonwealth's failure to advise defense counsel of the allegedly exculpatory DNA analysis report after Appellant was sentenced, Appellant argues that the prosecutor learned of the lab report soon after the verdict. Although the prosecutor claimed he faxed the report to defense counsel's office, the prosecutor took no further action thereafter. Appellant submits that the Commonwealth did not introduce any evidence at the double jeopardy hearing to substantiate the prosecutor's claim that he faxed the report to defense counsel as soon as he learned of its existence.

Appellant highlights testimony from defense counsel stating that no one from the Bucks County District Attorney's Office contacted him regarding the DNA evidence after the death sentence on October 22, 2008. Rather, defense counsel testified that he did not become aware of the DNA report until years later when he was contacted by attorneys representing Appellant in his PCRA proceedings. Defense counsel made clear that he would not have "overlooked" any fax regarding the DNA evidence had he received it. Appellant emphasizes testimony from defense counsel that the DNA analysis on the fingernail clippings would have been very significant and critical to the

_____

the failure of the other police officers and the prosecutor to review Detective Bonargo's police reports prior to trial; and (8) Detective Bonargo's decision to allow a capital murder investigation to proceed to trial without notifying the prosecutor or other police officers involved that DNA testing was not complete. (Appellant's Brief at 33-34).

defense because it was consistent with Appellant's theory that his co-defendant Steven Miranda was the shooter and that Miranda had physical contact with Lisa Diaz before her death.

Appellant insists the Commonwealth's actions, even if unintentional, "yielded a substantial risk of depriving [Appellant] of his right to a fair trial." (*Id.* at 25). Appellant concludes the prejudice here is "obvious" because he proceeded to trial without critical exculpatory evidence, and this Court must reverse the trial court's decision and bar retrial on double jeopardy grounds.[8] We disagree.

This Court has explained:

> The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of denying him a fair trial. However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct.

*Commonwealth v. Wilson*, 147 A.3d 7, 13 (Pa.Super. 2016) (internal

---

[8] Alternatively, Appellant asks this Court to bar the Commonwealth from retrying his case as a capital homicide prosecution, claiming that the Commonwealth's errors deprived him not only of a fair trial, but also of a fair sentencing. (*See id.* at 41-43). Because Appellant did not preserve this claim in his concise statement of errors, this argument is waived. *See generally Commonwealth v. Snyder*, 870 A.2d 336 (Pa.Super. 2005) (explaining that where trial court does not order appellant to file Rule 1925(b) statement, and appellant files one on his own accord, he is limited on appeal to raising only those issues he presented in his voluntary Rule 1925(b) statement).

- 14 -

citations omitted). ***See also Commonwealth v. Smith***, 532 Pa. 177, 186, 615 A.2d 321, 325 (1992) (holding double jeopardy clause of Pennsylvania Constitution prohibits retrial of defendant not only when prosecutorial misconduct is intended to provoke defendant into moving for mistrial, but also when conduct of prosecutor is intentionally undertaken to prejudice defendant to point of denial of fair trial). ***Compare Kearns, supra*** (holding prosecutor's **gross negligence** in failing to obtain and produce defendant's post-arrest written statement to police and statement of principal eyewitness was insufficient basis upon which to bar retrial on double jeopardy grounds; appropriate remedy in such circumstances is new trial).

In ***Johnson***, our Supreme Court considered whether the double jeopardy clause bars retrial "where the Commonwealth obtains a conviction based on false evidence and its misconduct, while not undertaken with the intent to deny the defendant a fair trial, nevertheless stems from prosecutorial errors that rise substantially above ordinary negligence." ***Johnson, supra*** at ___, 231 A.3d at 810. The relevant facts of ***Johnson*** are as follows. During investigation of the victim's death, police recovered a red baseball cap located in the middle of the street approximately nine feet from the victim's body. The cap was assigned a property receipt number. Shortly after the murder, the victim's friend Ms. Williams gave a statement to police. Ms. Williams was with the victim on the night of the murder and described the details of her observations to police. Ms. Williams also explained that the victim had worn

a black baseball cap on the night in question. After the shooting, Ms. Williams picked up the black baseball cap, which had a bullet hole in it, and she gave it to police while giving her statement. The black baseball cap was assigned a separate property receipt number and was submitted to the crime lab for testing. Testing revealed the presence of the victim's blood under the brim of the black cap. Several years later, upon new information connecting the appellant to the crime, police obtained a sample of the appellant's DNA and submitted it for testing along with the red cap. Testing showed the appellant was a contributor to the DNA in the sweatband of the red cap.

The Commonwealth subsequently proceeded with its prosecution of the case as if there was only one baseball cap—the red one—which the Commonwealth argued contained both the victim's blood and the appellant's DNA. Nevertheless, the Commonwealth's argument was factually inaccurate, as neither cap had DNA from both individuals.

At trial, the Commonwealth's crucial piece of physical evidence was the red baseball cap, and the prosecutor repeatedly suggested that the appellant had shot the victim at point blank range. Consistent with the Commonwealth's factually inaccurate theory of the case, the lead crime-scene investigator testified at trial that when he recovered the red baseball cap from the scene, he saw fresh blood underneath the brim of the cap. The Commonwealth's forensic scientist also testified that the victim's blood and the appellant's DNA were both found on "the hat." In closing argument, the prosecutor again told

the jury that the DNA evidence showed the appellant's sweat on the sweatband of the red cap, as well as the victim's blood on the brim.

In PCRA proceedings, the appellant learned the two caps, a red one and a black one, had been analyzed in connection with the Commonwealth's case, and that the victim's blood was found only on the black one. The Commonwealth thereafter agreed that the appellant was entitled to a new trial. The appellant subsequently filed a motion to dismiss based on double jeopardy grounds. The appellant learned during discovery related to the motion to dismiss, that the Commonwealth had "misunderstood its own evidence and conflated the findings related to the red and black caps." *Id.* at ___, 231 A.3d at 813-14. Notwithstanding the "unimaginable mistakes by experienced police officers and an experienced prosecutor" made in the case, the trial court found no intentional misconduct or bad faith on the Commonwealth's part and denied the appellant's motion to dismiss. *Id.* at ___, 231 A.3d at 815-16. This Court affirmed the trial court's ruling.

On appeal to the Supreme Court, the Court initially decided that the record supported the trial court's credibility determinations in favor of the Commonwealth. The Court stated that the trial court had personally heard extensive testimony from numerous witnesses involved in the prosecution, actively questioned many of the witnesses himself, and ultimately credited the prosecutor's testimony and found the Commonwealth had not acted with the intent to deprive the appellant of a fair trial. *Id.* at ___, 231 A.3d at 818-19.

Regarding the scope of double jeopardy protections, the Supreme Court held that "prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result." *Id.* at \_\_\_, 231 A.3d at 826. In so holding, the Court clarified that it did not "suggest that all situations involving, "serious prosecutorial error implicate double jeopardy[.]" *Id.* Rather, "retrial is only precluded where there is prosecutorial **overreaching**—which, in turn, implies some sort of conscious act or omission." *Id.* (emphasis in original).

Applying its holding to the facts of the case at hand, the Court emphasized the trial court's findings that the prosecutor had made "almost unimaginable" mistakes, which "dovetailed" with other serious errors by law-enforcement officers and other police personnel such as the DNA lab technician. *Id.* Recounting the errors in the case, the Court highlighted: (1) the prosecutor's failure to notice that there were two property receipt numbers for the two caps, and his failure to verify whether the receipt numbers pertained to different caps; (2) the prosecutor's failure to obtain a criminalistics report which would have summarized the evidence and revealed that there were two different caps involved; (3) the failure of the detective who had interviewed Ms. Williams on the night of the shooting to recall the evidence of the black baseball cap and Ms. Williams' statement that the victim

- 18 -

had worn the black cap on the night of the murder; (4) the false testimony from the lead crime scene investigator at trial that he saw fresh drops of blood under the brim of the red cap on the night of the murder, which was factually inaccurate. On this point, the Court stated it could not "escape the conclusion that the officer testified to something that he did not actually observe[.]" ***Id.*** at ___, 231 A.3d at 827. Thus, the Supreme Court held that the Commonwealth's actions were "strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial." ***Id.*** Such actions prejudiced the appellant to the point of a denial of a fair trial, immunizing the appellant from retrial for the murder of the victim.

Instantly, in rejecting Appellant's current double jeopardy motion, the court explained:

> [Appellant's] circumstances are considerably different from that of the defendant in [***Johnson***]. [Appellant's] case is distinguishable because the Commonwealth did not engage in reckless misconduct with a conscious disregard for a substantial risk of an unfair trial.
>
> [At the double jeopardy hearing], Detective John Bonargo testified to his role in transporting physical evidence to the [PSP] Laboratory. Detective Bonargo claimed that the laboratory, without his express request, conducted tests upon physical evidence (Lisa Diaz's fingernail clippings). Detective Bonargo retrieved the evidence from the laboratory along with a serology report that he claimed to have placed on his Sergeant's desk.
>
> Detective Bonargo stated, to this personal regret, that he had no further conversations about the DNA report with either the trial prosecutor, Gary Gambardella, or Detective

Sean Harold, one of the lead investigators[.]

*    *    *

Gambardella and Detective Harold had no knowledge of the DNA report prior to and during [Appellant's] trial. Detective Harold confirmed this claim when asked about his knowledge of the submission of the evidence and its subsequent testing[.]

*    *    *

Detective Harold further asserted that he had no prior knowledge of fingernail clippings taken from Lisa Diaz's autopsy and had never requested for them to be sent for laboratory testing.

*    *    *

During the same hearings, prosecutor Gambardella, now District Judge Gambardella, asserted that he was unaware of any DNA items being submitted for testing after [Appellant's] arrest.

*    *    *

During [Appellant's] trial, the prosecutor was not made aware of any DNA evidence sent for laboratory testing. It was not until after the trial that he was notified of the existence of the DNA analysis report, which he sent immediately to [Appellant's] prior trial counsel.

*    *    *

As we noted in our first Opinion on [Appellant's] initial Double Jeopardy claim, this [c]ourt viewed these events to be evidence of "not minding the store"; that while inadvertent, it did not rise to the level of intentional misconduct.

This [c]ourt previously held that the Commonwealth and the police had a lapse in communication that did not rise to a conscious disregard of the rights of [Appellant]. The prosecution was unaware of the DNA report's existence and

- 20 -

> therefore was not barred from retrial on Double Jeopardy grounds.
>
> This [c]ourt further distinguishes [Appellant] from [*Johnson*]. Here, the Commonwealth did not present "false evidence" that prejudiced [Appellant] and denied him a fair trial.
>
> In contrast to [*Johnson*], where the Commonwealth relied upon fabricated evidence that one hat contained **both** the defendant and victim's DNA, [Appellant] was never subjected to similar prejudice by the Commonwealth during trial.
>
> At no point did the Commonwealth attempt to use the DNA report from Lisa Diaz's fingernail clippings against [Appellant]. As previously stated, the Commonwealth did not have knowledge of the report's existence and, therefore could not and did not rely upon its findings during the trial.

(Trial Court Opinion, filed December 21, 2020, at 17-21) (internal citations omitted). In sum, the trial court decided, "the Commonwealth did not engage in any intentional misconduct, and its actions, while perhaps being less than careful, did not rise to the type of 'recklessness' requiring a dismissal upon Double Jeopardy grounds." (*Id.* at 23). We agree with the court's analysis.

Initially, we see no reason to disrupt the court's credibility determinations in favor of the Commonwealth, which are supported by the record. *See Graham, supra*. *See also Johnson, supra* at ___, 231 A.3d at 818 (discussing great deference afforded to trial courts regarding credibility determinations).

Further, the only "false evidence" on which Appellant relies is distinguishable from that in *Johnson*. Here, Appellant insists Detective

- 21 -

Harold falsely testified that the murder weapon was not submitted for DNA analysis. (Appellant's Brief at 21) (citing N.T. Trial, 9/24/08, at 58). Appellant insists the DNA analysis report showed the Commonwealth did submit swabs from the firearm to the PSP Bethlehem lab for analysis. Detective Harold explained at the double jeopardy hearing that he did not believe the firearm was submitted for testing due to contamination, where it had been sitting in an unlocked vehicle for days after the murder, with an open sunroof, and it had rained. Although his trial testimony that the gun was not submitted for testing was incorrect, it is undisputed that no DNA evidence was recovered from the gun in the analysis. Significantly, Appellant does not claim that any of the Commonwealth's witnesses offered "false testimony" at trial concerning DNA analysis of the fingernail clippings, which are the subject of this appeal. Thus, we agree with the Commonwealth that Detective Harold's misstatement is a "far cry from the problematic testimony at issue in *Johnson*." (*See* Commonwealth's Brief at 46).

Notwithstanding the Commonwealth's unfortunate errors in this case, they do not rise to the level of recklessness displayed in *Johnson*. On this record, we cannot agree with Appellant that the Commonwealth engaged in "prosecutorial overreaching" by acting "with a conscious disregard for a substantial risk" of depriving Appellant of a fair trial. *Johnson, supra* at ___, 231 A.3d at 826. Under these facts, the remedy for the Commonwealth's actions is precisely what the court ordered here—a new trial. *See Kearns,*

*supra*. *See also Commonwealth v. Rivera*, 241 A.3d 411 (Pa.Super. 2020) (unpublished memorandum),[9] *appeal denied*, ___ Pa. ___, 252 A.3d 235 (2021) (summarizing Commonwealth's errors in case as (a) failing to inform appellants that lead investigator was going to be called at trial as expert witness; (b) failing to provide PowerPoint presentation to appellants before trial, and altering one of slides without first notifying appellants; (c) introducing photographs during trial that it failed to disclose to appellants before trial; (d) destroying cell phone containing text messages that agent testified about during trial; and (e) failing to disclose prior to trial inculpatory statement made by one appellant to agent; holding Commonwealth was responsible for pattern of minor omissions, but not reckless and systematic overreaching; Commonwealth's errors were negligent rather than reckless or intentional; facts of case were distinguishable from *Johnson*, and proper remedy was retrial under *Kearns*).  Based upon the foregoing, we affirm the order denying Appellant's second motion to dismiss the charges against him based on double jeopardy grounds.

Order affirmed.

---

[9] *See* Pa.R.A.P. 126(b) (stating non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for persuasive value).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/4/2021</u>