J-S02025-24

**¶NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEONARD H. COPES | : | |
| | : | |
| Appellant | : | No. 131 EDA 2023 |

Appeal from the PCRA Order Entered December 20, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010727-2010

BEFORE:  LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED MARCH 5, 2024**

Leonard H. Copes (Appellant) appeals from the order dismissing his second petition filed under the Post Conviction Relief Act (PCRA).[1]  We affirm.

This Court previously summarized the underlying facts:

> On February 25, 2010, at approximately 9 p.m., Jakirah Cromwell was walking to a friend's house in South Philadelphia when she saw [Appellant], whom she had seen around the neighborhood, standing with another man whom she did not know.  [Appellant] asked her if she knew "the two boys who were walking down Taney."  Ms. Cromwell told [Appellant] that she did not know whom he was talking about.  [Appellant] then told Ms. Cromwell not to walk down Taney Terrace.  When Ms. Cromwell asked him why not, [Appellant] responded "because I told you not to."  After Ms. Cromwell stated "[y]ou know where I'm going," [Appellant] told Ms. Cromwell to "[j]ust hurry up and go, I'm trying to help you out."  As Ms. Cromwell started to walk down Taney Terrace, [Appellant] had a gun in his hand and the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

unidentified man with him had a gun on his hip. While Ms. Cromwell walked away, [Appellant] and the other man stayed on the corner of Jackson Street and Taney Terrace "looking around." While walking down Taney Terrace, Ms. Cromwell heard a gunshot and ducked behind a car. She saw one person running and another person fall to the ground. She then saw "flashes" from a gun as [Appellant] and the unidentified man ran past the car behind which she was hiding, and saw the man with [Appellant] fire another shot at the man who had already collapsed. She heard [Appellant] then say, "[c]ome on, what you doing, he already fell." Ms. Cromwell got up and ran to her aunt's house.

Sean Griffith and Khalil Thorpe had been walking from Mr. Griffith's grandfather's home toward the home of Chanae Floyd, Mr. Griffith's girlfriend. As they neared her house, reaching the intersection of Point Breeze [Avenue] and Taney Terrace, Mr. Griffith heard someone begin firing shots at them from behind. Mr. Griffith turned around and saw [Appellant] holding a gun and shooting at him and Mr. Thorpe. Mr. Griffith managed to run away without being shot, despite hearing eight shots fired in his and Mr. Thorpe's direction. After he got several blocks away and saw that Mr. Thorpe was not with him, Mr. Griffith called Ms. Floyd and asked her to look outside her house to see if she could see Mr. Thorpe. Ms. Floyd ran outside and saw Mr. Thorpe lying in the street. She called an ambulance and stayed with Mr. Thorpe until police arrived.

When police arrived, there were no signs of life from Mr. Thorpe. He was transported to the University of Pennsylvania Hospital, where he was pronounced dead at 9:40 p.m. He had one gunshot wound to the abdomen, one to the chest, and one to the arm.

Ms. Floyd was interviewed by [h]omicide detectives and informed them of Mr. Griffith's phone call and the fact that he had been with Mr. Thorpe when he was shot. Detectives then interviewed Mr. Griffith, who at first denied seeing who shot at him[] and Mr. Thorpe, claiming that the shooter was covering his face with his arm. During his second interview, Mr. Griffith told detectives that it was [Appellant], whom he had known for years, who had shot at him and killed Mr. Thorpe. He positively identified [Appellant] from a photo array. Jakirah Cromwell also gave a statement to police, in which she described what she had seen and heard, and identified [Appellant] from a photo array.

*Commonwealth v. Copes*, 83 A.3d 1055, 1227 EDA 2012 (Pa. Super. 2013) (unpublished memorandum at 1-3) (quoting Trial Court Opinion, 7/15/12, at 2-4).

On December 15, 2011, a jury convicted Appellant of first-degree murder, possession of an instrument of crime, and attempted murder.[2] The trial court sentenced him to life in prison without the possibility of parole.

Appellant filed a direct appeal from his judgment of sentence, challenging, *inter alia*, the weight and sufficiency of the evidence, the admissibility of certain evidence, and the trial court's jury instructions regarding transferred intent and accomplice liability. *See id.* at 4-5. This Court affirmed Appellant's judgment of sentence, after which the Pennsylvania Supreme Court denied allowance of appeal. *See id.*, *appeal denied*, 83 A.3d 413 (Pa. 2013).

In 2014, Appellant, *pro se*, filed his first PCRA petition, raising a multitude of claims, including ineffective assistance of trial counsel and challenges to the admissibility and credibility of certain witness statements. *Commonwealth v. Copes*, 203 A.3d 305, 4015 EDA 2017 (Pa. Super. 2018) (unpublished memorandum at 4-6). The PCRA court appointed counsel, who filed a no-merit letter and request to withdraw pursuant to *Commonwealth v. Turner*, 544 A.2d 937 (Pa. 1988), and *Commonwealth v. Finley*, 550

---

[2] 18 Pa.C.S.A. §§ 2502(a), 907(a), 901(a).

A.2d 213 (Pa. 1988). The PCRA court dismissed Appellant's petition without a hearing and granted counsel's request to withdraw. Appellant, *pro se*, filed an appeal to this Court, but we deemed his issues waived due to his vague Pa.R.A.P. 1925(b) statement. **Copes**, 203 A.3d 305 (unpublished memorandum at 8-9). Appellant did not seek allowance of appeal.

On January 12, 2022, Appellant, *pro se*, filed the instant, second PCRA petition. On April 11, 2022, he supplemented the petition with an affidavit from Tyshon Baldwin (Baldwin), an alleged after-discovered witness. Baldwin alleged he witnessed "a friend named Haneef Young" commit the murder. Baldwin Affidavit, 2/5/22.

On June 8, 2022, the PCRA court scheduled an evidentiary hearing on the Baldwin claim and appointed counsel to represent Appellant.[3] On November 22, 2022, Baldwin testified at the evidentiary hearing. The PCRA court summarized Baldwin's account of the murder:

> Mr. Baldwin testified that, at the time of the murder, he was sitting on the steps of a building on Jackson Street at the intersection of Jackson Street and Taney Terrace[,] selling marijuana. He stated that he arrived on the block with a friend named Haneef Young and that Mr. Young sat there with him for "some time." According to Mr. Baldwin, at some point approximately an hour after they arrived, Mr. Young left the steps, walked across the street, and proceeded to stand on the corner of

---

[3] The PCRA court's opinion indicates that it dismissed the remainder of Appellant's claims on June 8, 2022, but the certified record does not disclose a separate disposition of those claims. **See** PCRA Court Opinion, 3/21/23, at 2. The PCRA court's December 20, 2022, order dismissed Appellant's petition in full. Order, 12/20/22. The Baldwin claim is the only claim involved in the instant appeal.

- 4 -

Jackson Street and Taney Terrace. [Mr. Baldwin] testified that, after about 20 or 30 minutes, two people walked down Taney Terrace coming from 27th [S]treet. Mr. Baldwin stated that he could tell one of these individuals was a man and that both people were tall, skinny, and wearing hoods[,] but he could not otherwise identify them. Mr. Baldwin testified that, once the two people were within approximately four and a half houses of Mr. Young, Mr. Young began shooting at the two people down the sidewalk of Taney Terrace towards Point Breeze Avenue. [Mr. Baldwin] stated that he could see the gun in Mr. Young's hand and that Mr. Young was the only shooter. Mr. Baldwin stated he could see all the way down Taney Terrace to Point Breeze Avenue and that no one else was present on Taney Terrace except for him, Mr. Young, and the two people walking down the street.

Mr. Baldwin stated that when the shooting began, he stood up but otherwise did "nothing." He stated that, even though the shooting was a "total surprise," he did not say anything, did not move to the street, and did not run away when the shooting began. He testified that, after the shooting, he walked down the alley between Taney and Bailey Terraces towards Point Breeze Avenue[,] and Mr. Young walked away towards Etting Terrace.

Mr. Baldwin testified that when he got to Point Breeze Avenue, he saw "a person laying on the ground and a girl crying and stuff like that." He stated that he knew the girl crying from the neighborhood and identified her as "Nae." Mr. Baldwin testified that he did not know the person lying on the ground and could not tell if the person was male or female. He stated that he did not call the police because he was afraid of Mr. Young, he did not believe the person had died, and he was worried about the fact that he was present for the shooting. Mr. Baldwin also explained that once police arrived, he walked off. He stated he did not try to flag down the officer to tell police he witnessed the shooting and that no officers stopped him.

PCRA Court Opinion, 3/21/23, at 6-8 (internal record citations omitted).

The PCRA court also described Baldwin's testimony regarding his actions

since the day of the murder:

Mr. Baldwin testified that he briefly spoke to Mr. Young the following day and, even though he was curious about the shooting,

- 5 -

he did not ask Mr. Young about what had occurred. Mr. Baldwin stated that Mr. Young passed away in 2015, about five years after the shooting. He stated that he found out about Mr. Young's death six months later. Mr. Baldwin explained that he decided to come forward six months after finding out Mr. Young had died. He stated he wrote an affidavit while incarcerated in 2017. According to Mr. Baldwin, he first tried to send this affidavit to "somebody on the street to get it to [Appellant's] family." Mr. Baldwin also stated that he tried to send it directly to [Appellant] at SCI Houtzdale. Mr. Baldwin testified that he never heard anything back from the person to whom he first sent the affidavit nor [from Appellant] for six years. He testified that he does not know what happened to this affidavit. Mr. Baldwin stated he only realized [Appellant] never received the 2017 affidavit when someone reached out to [Mr. Baldwin] and, at that point, he drafted another affidavit … and had it notarized in February 2022.

Mr. Baldwin testified that he knew [Appellant] was arrested for the murder the day after the arrest in 2010. He stated that he knew [Appellant] from the neighborhood, knew generally where [Appellant] was living at the time of the arrest, and knew [Appellant's] brother. However, Mr. Baldwin explained that he did not talk to [Appellant] about being a witness at the time of [Appellant's] arrest. Furthermore, Mr. Baldwin agreed that he waited six years after Mr. Young's death to come forward with the second affidavit.

*Id.* at 8 (internal record citations omitted).

At the continuation of the evidentiary hearing on December 20, 2022, the Commonwealth presented witnesses to authenticate certain emails it offered as evidence against Appellant.[4] On March 21, 2021, using a prison communications system, Appellant sent an email, through a third party, to

_____

[4] The transcript of the December 20, 2022, hearing is not included in the certified record, though the PCRA court's opinion cited that transcript extensively in summarizing the testimony adduced at the hearing. *See* PCRA Court Opinion, 3/21/23, at 9-12. Appellant's brief notes the transcript's absence from the record, but indicates Appellant does not dispute the PCRA court's account of the testimony. Appellant's Brief at 4 n.1.

Donnell Nutter (Nutter), an inmate incarcerated with Appellant at SCI Houtzdale. Appellant's email stated:

> Yo bro, its time. I need u. They denied all my appeals and I need u to do that affidavit for me. All u have to do is say when Buck came to the crib that night, he never said my name. He told everyone he didn't see who killed Leef and when he went to the detectives office and came back home, he said they tried to threaten him and charge him with the murder if he didn't say I was the one who did it. He said the same thing on his affidavit, so every one story will match …. Its gone work because he put ya name in the statements saying u was one of the guys he saw that night after the crime. U just have to let me know if its a go, so I could get my lawyer to holla at u. It shouldn't be hard. Plus my uncle gone drop some money on u between 500$ & 1,000 for helping out…. All yall gone be a big key to my case…. Dont let me down….

Commonwealth Exhibit 2 (Inmate Messages Report) at 2 (unpaginated; capitalization modified). On May 16, 2021, Nutter responded to Appellant, through a third party, stating, "I got u bro yea that last message u sent bro was goofy bro u know they read these joins! but u know I got u ski!" *Id.* at 5 (unpaginated).

> On April 11, 2021, Appellant sent an email to Baldwin, stating:

> I appreciate u for still tryna help out …. I need all the help I could get. I exhaust all my appeal rights …. My uncle talked to [an attorney who said] I was timed bar and only way he could help is if, I get some newly discovered evidence, so that's what I've been working on, my alibi witnesses …. I wanted u to link up with my uncle because he the one helping me find my witnesses and get a few affidavits from people letting the truth be known …. So what ever u can do will be a big help …. Im gone write my uncle tonight and tell him to get with u asap….

*Id.* at 4 (unpaginated; capitalization modified).

- 7 -

On December 20, 2022, after the hearing, the PCRA court dismissed Appellant's petition. Order, 12/20/22. The PCRA court found Baldwin's testimony incredible, and therefore concluded his testimony did not undermine confidence in the verdict. PCRA Court Opinion, 3/21/23, at 12-13. In support of its credibility determination, the PCRA court cited its "opportunity to observe and evaluate Mr. Baldwin's believability as a witness," Baldwin's "extraordinary delay in … coming forward," and Appellant's emails. *Id.* at 13.

The PCRA court further noted Appellant's email to Nutter involved Appellant offering "between $500 and $1,000 to secure an affidavit from Mr. Nutter and detailed what Mr. Nutter should say in the affidavit." *Id.* The PCRA court found Nutter's response ("u know they read these [messages]!") "reflect[ed] the illicit nature of [Appellant's] communication." *Id.* The PCRA court also found Appellant's email to Baldwin "significant in that it made no mention of Mr. Baldwin having seen the shooting, and only reflected [Appellant's] efforts to find alibi witnesses as 'newly discovered evidence.'" *Id.*; *see also* 42 Pa.C.S.A. § 9545(b)(1)(ii) (newly-discovered evidence exception to the PCRA's jurisdictional time-bar).

Appellant filed a timely appeal. Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for review:

> I. Did the PCRA court abuse its discretion in failing to find the testimony of Tyshon Baldwin credible at the evidentiary hearing?

II. Did the PCRA court abuse its discretion in finding that the content of emails offered by the Commonwealth discredited the testimony of Tyshon Baldwin?

III. Did the PCRA court abuse its discretion in finding that emails offered into evidence by the Commonwealth indicated that the Appellant was attempting to pay for witnesses' testimony or that he had paid for testimony?

Appellant's Brief at 2 (capitalization modified).

We review the dismissal of a PCRA petition to determine "whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." ***Commonwealth v. Busanet***, 54 A.3d 35, 45 (Pa. 2012). "Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the party who prevailed in the PCRA court proceeding." ***Id.***

Before reaching the merits of Appellant's claim, "we must first consider the timeliness of [his] PCRA petition because it implicates the jurisdiction of this Court and the PCRA court." ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa. Super. 2014). "The timeliness of a PCRA petition is jurisdictional. If a PCRA petition is untimely, a court lacks jurisdiction." ***Commonwealth v. Reeves***, 296 A.3d 1228, 1230-31 (Pa. Super. 2023).

A PCRA petition "shall be filed within one year of the date the judgment becomes final[.]" 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final "at the conclusion of direct review … or at the expiration of time for seeking the review." ***Id.*** § 9545(b)(3).

Appellant's judgment of sentence became final on December 31, 2013, when direct review concluded with the Pennsylvania Supreme Court's denial of allowance of appeal. ***See Copes***, 83 A.3d 413. Appellant's January 12, 2022, petition is therefore facially untimely. "However, a petitioner may overcome the PCRA's time-bar if he pleads and proves one of the statutory exceptions set forth in 42 Pa.C.S.A. § 9545(b)." ***Reeves***, 296 A.3d at 1231. One exception is that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence…." 42 Pa.C.S.A. § 9545(b)(1)(ii).

Appellant alleged the facts previously unknown to him, which "could not have been ascertained by the exercise of due diligence," included a "newly-discovered eyewitness with exonerating testimony." PCRA Petition, 1/12/22, at 3. He alleged, "Tyshon Baldwin on 4/19/21 came forth with [an] exculpatory statement." ***Id.*** at 4. Appellant further alleged he first learned of Baldwin's evidence in an April 19, 2021, "e-mail/message" he received from Baldwin. ***Id.*** (additional handwritten page designated "4(rr)").

As Appellant filed his petition within one year of the date Baldwin came forward with his statement, his petition properly invoked the newly-discovered fact exception. ***See*** 42 Pa.C.S.A. § 9545(b)(2) (any petition invoking the newly-discovered fact exception "shall be filed within one year of the date the

claim could have been presented.").[5]  Thus, we may address Appellant's underlying claim.

The PCRA affords relief where a conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."  42 Pa.C.S.A. § 9543(a)(2)(iv).  To obtain relief based on a claim of after-discovered evidence, a petitioner

> must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008).  "Failure to satisfy any one prong [of this test] is fatal to the claim."  *Commonwealth v. Crumbley*, 270 A.3d 1171, 1178 (Pa. Super. 2022).

All three of Appellant's issues relate to the PCRA court's finding that Baldwin's testimony was incredible.  Here, the PCRA court determined Appellant's after-discovered evidence was not likely to result in a different verdict, because it found Baldwin's testimony incredible.  PCRA Court Opinion, 3/21/23, at 12.  As our Supreme Court has observed:

> A PCRA court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference

---

[5] The Commonwealth did not dispute that Appellant's claim regarding Baldwin's statement satisfied the newly-discovered facts exception.  *See* Commonwealth Response to PCRA Petition, 5/24/22, at 6 n.2.

by reviewing courts. *See, e.g., Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006); *Commonwealth v. Santiago*, 855 A.2d 682, 694 (Pa. 2004) (plurality) ("[W]e are bound by the PCRA court's credibility determinations where there is record support for those determinations."); *Commonwealth v. Abu–Jamal*, 720 A.2d 79, 99 (Pa. 1998) ("Just as with any other credibility determination, where the record supports the PCRA court's credibility determinations, those determinations are binding on this [C]ourt."). Indeed, one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone.

*Commonwealth v. Johnson*, 966 A.2d 523, 539 (Pa. 2009) (citations modified).

Appellant first argues the PCRA court improperly based its credibility determination "on the fact that Tyshon Baldwin had not come forward sooner." Appellant's Brief at 10. He argues Baldwin had a reasonable explanation for his delay because he was afraid of Young and could not come forward until after Young's death. *Id.* at 10-11. The PCRA court noted, however, that Baldwin "agreed that he waited six years after Mr. Young's death to come forward…." PCRA Court Opinion, 3/21/23, at 8. It also noted Baldwin knew in 2010 that Appellant had been arrested for the murder but waited nearly twelve years to come forward. *Id.* at 12. Viewed in the light most favorable to the Commonwealth as the prevailing party, we discern no abuse of the PCRA court's discretion in considering Baldwin's delay as a factor in its credibility determination. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1288-89 (Pa. Super. 2021) ("Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to

substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record." (citations omitted)).

Appellant next argues the PCRA court improperly considered Appellant's email exchange with Nutter as a factor in determining Baldwin's credibility. Appellant's Brief at 11. He maintains the Nutter emails are "unrelated to the credibility of Baldwin," and that the "specific content" of Appellant's email to Baldwin suggests no "wrongdoing." *Id.*

Our review discloses that, in the Nutter exchange, Appellant advised Nutter what his affidavit should say and assured him Appellant's uncle would pay him for "helping out." Commonwealth Exhibit 2 at 2 (unpaginated; capitalization modified). Our review further discloses that less than one month later, Appellant urged Baldwin "to link up with my uncle because he [is] the one helping me find my witnesses and get a few affidavits from people…." *Id.* at 4 (unpaginated; capitalization modified).

We discern no abuse of the PCRA court's discretion in considering the email exchanges as a factor undermining Baldwin's credibility. Our review discloses that the exchanges are close in time and tenor. The PCRA court found that, taken together, the emails "tend[ed] to show that [Appellant's] after-discovered evidence was not worthy of belief." PCRA Court Opinion, 3/21/23, at 13. The record supports this finding.

Finally, Appellant argues that, if properly considered, the Nutter email militates *in favor* of Baldwin's credibility. Appellant's Brief at 12. According to Appellant, the Nutter email explicitly offers payment, showing "that [Appellant] has no hesitation to discuss payment," even over a monitored communications system. *Id.* at 12. Appellant asserts the lack of a similarly explicit offer to Baldwin suggests there was, in fact, no arrangement to pay Baldwin. *Id.*

The PCRA court did not make a specific finding that Baldwin was paid for his testimony, but found the "illicit nature" of the emails to be a factor "undermining the credibility of" Baldwin's testimony. PCRA Court Opinion, 3/21/23, at 13. The PCRA court's interpretation of the emails is supported by the record and, therefore, binding on this Court.[6] *See Johnson, supra*.

Accordingly, none of Appellant's issues merit relief. We discern no abuse of the PCRA court's discretion in dismissing Appellant's second PCRA petition.

Order affirmed.

---

[6] Appellant asserts the PCRA court's only factors in determining Baldwin's testimony was incredible were Appellant's emails and Baldwin's delay in coming forward. Appellant's Brief at 12. He maintains the PCRA court made no finding that Baldwin's "demeanor made him appear to be unreliable." *Id.* However, the PCRA court expressly cited as a factor its "opportunity to observe and evaluate Mr. Baldwin's believability as a witness…." PCRA Court Opinion, 3/21/23, at 13.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>3/5/2024</u>