2025 PA Super 46

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TREVOR LEE KUJAWA | : | No. 510 MDA 2024 |

Appeal from the Order Entered March 26, 2024
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0000417-2022

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

OPINION BY BECK, J.:                    **FILED: February 25, 2025**

The Commonwealth appeals from the order of the Cumberland County Court of Common Pleas ("trial court") barring the retrial of Trevor Lee Kujawa ("Kujawa") for sex crimes alleged to have been committed against E.K. based on a finding of reckless prosecutorial conduct.  Specifically, the trial court determined that Assistant District Attorney Lauren Perchinski ("ADA Perchinski") failed to adequately prepare Trooper Nicholas Bierzonski for trial, as he violated a trial court order prohibiting the mention of other sexual assault charges against Kujawa and the alleged victim, C.R.  After careful review, we reverse and remand for further proceedings.

**Factual and Procedural Background**

The legal question presented requires a fact-intensive analysis and we thus begin with a discussion of the material circumstances.  E.K. testified to the following version of events.  She and Kujawa were "really good friends,"

particularly during her junior year of high school. N.T., 12/6/2023, at 19. On May 14, 2021, E.K. and several of her female friends were having a sleepover. Sometime late in the evening, E.K., who had smoked marijuana, wanted food from Sheetz. *Id.* at 21. She did not want to drive while intoxicated and called Kujawa for a ride. *Id.* at 22. He drove her to Sheetz, told her to stay in the car, and "came out with a box of condoms" instead of food. *Id.* at 23. Kujawa began driving around, and she asked, "where are we going?" *Id.* at 24. He replied, "you tell me." *Id.* She suggested they "drive around or … go back" to her friend's house. *Id.* Kujawa drove her to a parking lot, parked his vehicle, and went to the backseat, asking her to "come back here[,] … that kind of thing." *Id.* at 25. She repeatedly declined, but Kujawa persisted and eventually "pulled [her] back into the seat" with him. *Id.* He started kissing E.K. and tried "to have sex with [her]," but she continued to say no. *Id.* at 28. Kujawa eventually took her pants off, put on a condom, and then tried to penetrate her vagina with his penis. Throughout, she continued "trying to reason with him," telling him, "I don't want to do this[.]" *Id.* at 30, 31. He was unable to fully penetrate and "gave up on that." *Id.* at 31. Kujawa then indicated he wanted oral sex. She said no, and Kujawa "put his hand on the back of [her] head and then forced [her] head down" onto his penis. *Id.* at 33. He eventually ejaculated into a towel and then drove her back to her friend's house. *Id.* at 34. Kujawa texted her a few days later, apologizing for what happened and saying there "was some sort of misconception, but it's

100 percent on" him. *Id.* at 38. E.K. replied with "[her] side of things," and Kujawa responded "that's not the way he remember[ed] it." *Id.* at 39.

On cross-examination, E.K. testified that it is possible she asked to have sex that evening. *Id.* at 47 (Defense counsel asking, "Is it possible that you don't remember asking due to alcohol consumption?" and E.K. responding, "Maybe."). Kujawa further confronted E.K. with additional text messages from the evening of the incident. E.K. agreed that she had texted Kujawa that evening at approximately 7:50 p.m. to ask what he was doing. *Id.* at 51. He replied, "nothing." *Id.* at 52. E.K. texted that she was "single and ready to mingle." *Id.* Kujawa replied with slang for "that's a lie," and E.K. replied, "swear to G[-]d." *Id.* at 56. He replied again with "you're lying," and she replied, "[Kujawa], I swear to G[-]d on my life, if you say sneaky link, we will sneaky link." *Id.* E.K. explained that "sneaky link" meant "when you meet someone in secret. You could just like hang out. Sometimes it refers to sex. Sometimes it doesn't." *Id.* E.K. stated that she and Kujawa would often make these kinds of jokes, but he knew that she had a girlfriend, J.N. *Id.* at 84.

As to J.N., E.K. agreed that as of the morning of May 14 the two were having difficulties. *Id.* at 55. E.K. and J.N. argued throughout the day, with J.N. accusing E.K. of being manipulative. *Id.* at 61. The two girls used a feature on their phones that allowed the other to see their current location. *Id.* at 59-60. At 7:44 p.m., E.K. rescinded J.N.'s access to the feature, six minutes before she texted Kujawa to ask what he was doing. *Id.* at 61. On May 15, however, she decided to patch things up with J.N. *Id.* at 82.

- 3 -

E.K. stated that the story about what happened between Kujawa and E.K. began making its way around the school, and on May 26, 2021, she went to speak to the school's guidance counselor for advice. *Id.* at 83. The counselor fulfilled her mandated reporter duties and informed the police. *Id.* Trooper Bierzonski assumed investigative duties and ultimately filed a criminal complaint charging Kujawa with various crimes relating to both E.K. and another high school student, C.R., with an accompanying affidavit of probable cause alleging that Kujawa's modus operandi for both assaults was similar. The assaults against C.R. were alleged to have occurred on January 23, 2021.

Kujawa filed a motion to sever the cases, which was granted on July 14, 2022, the day trial commenced on the charges concerning C.R. Upon motion by Kujawa, the trial court entered a pretrial order stating that "there shall be no mention of E.K., the investigation and/or charges relating to E.K., any communications to or from E.K., or any other reference directly or indirectly relating to E.K." Trial Court Order, 7/19/2023. The order additionally stated that the attorneys "shall inform their witnesses of the within directive. Failure to comply with the within directive shall be grounds for a mistrial." *Id.*

At the trial on charges related to C.R.,[1] Trooper Bierzonski was asked on cross-examination whether he interviewed Kujawa, who was by then a college student. N.T., 7/19/2022, at 43. Trooper Bierzonski explained, among other thing, that the authorities intended to have C.R. participate in a

---

[1] Certain testimony taken during this trial is relevant to the parties' appellate arguments.

consensual wiretap and did not want to tip him off that the police were investigating. *Id.* at 44-45. Kujawa noted that C.R. declined to participate in the wiretap in August and charges were filed three months later, asking, "Why not give [Kujawa] the opportunity to tell his side of the story?" *Id.* at 45. Trooper Bierzonski replied, "Well, again, I don't know if I can go into that side of it, but there were other elements of this case, which I believe I am not allowed to talk about," *id.*, at which point Kujawa interrupted to ask a follow-up question.[2] Kujawa did not object or request a mistrial.[3]

On October 12, 2023, in anticipation of the forthcoming trial involving E.K., Kujawa filed a motion seeking to bar evidence about the investigation and charges related to C.R. as the victim. The trial was postponed, rescheduled for December 6, 2023, and assigned to another jurist in the interim. Before the jury was brought in, the trial court referenced the pending motion to preclude any mention of C.R. and the charges related to her, asking the Commonwealth for its position. ADA Perchinski replied, "I'm in agreement with that, and we've instructed our witnesses accordingly." N.T., 12/6/2023, at 4. Kujawa informed the court that the parties "agreed on the form of an Order" and handed it to the court. The trial court signed and docketed the

---

[2] The information Trooper Bierzonski alluded to but could not testify to was E.K.'s participation in a consensual wiretap. Trooper Bierzonski discussed that issue at the evidentiary hearing on the motion to bar retrial. Specifically, he stated: "The other elements were … we did conduct [a] consensual wire where he made admissions to his sexual assaults[.]" N.T., 2/7/2024, at 26.

[3] Unrelated to this testimony, the trial ultimately ended in a mistrial when the jury could not reach a verdict.

order, remarking, "I presume you've both read it, so I expect you to comply with it." *Id.* The record reflects that Trooper Bierzonski was present for this exchange and announcement. *See* N.T., 2/7/2024, at 5.

E.K. was then called as the first witness and testified as previously summarized. The Commonwealth's next witness was Trooper Bierzonski, who was asked to provide basic information about his background. *See* N.T., 12/6/2023, at 99-100. The first question regarding the case resulted in a mistrial:

> Q. How did you first become aware of the allegations against [ ] Kujawa involving [E.K.]?
>
> A. It was brought to my attention when I had a conversation with my current crime supervisor at Carlisle Station that **there had been an incident that occurred with two girls from a school that had reported some information to a mandatory reporter**. Another trooper from the patrol unit actually responded and handled the initial report. When it was determined to be of a serious nature, then it was reassigned to me.

*Id.* at 100-01 (emphasis added).

Kujawa asked for a sidebar, stating, "I think that the Order that was issued at the beginning of the trial was just violated." *Id.* at 101. The trial court replied, "I agree." *Id.* Kujawa requested a mistrial, which the court immediately granted. ADA Perchinski did not comment or make any argument. The sidebar ended and the trial judge explained that a mistrial had been granted, remarking, "I would certainly entertain a motion to preclude further prosecution[.]" *Id.* at 102. ADA Perchinski said, "I'm sorry. What

was that, Your Honor?" *Id.* The trial court repeated the statement, and ADA Perchinski said, "Thank you, Your Honor," and nothing else. *Id.*

Kujawa thereafter filed a motion to bar retrial pursuant to Article I, Section 10 of the Pennsylvania Constitution based on our Supreme Court's decision in *Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020), which held that double jeopardy protections under the Pennsylvania Constitution extend to "misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result." *Id.* at 826. The motion asserted that ADA Perchinski recklessly failed to adequately prepare Trooper Bierzonski in light of the pretrial order. On this point, the motion suggested that the relevant facts for assessing whether the prosecutor was reckless extended to the events at C.R.'s trial. Specifically, Kujawa claimed that Trooper Bierzonski "ma[de] indirect reference to E.K.'s claims in response to a cross-examination question" at that prior trial, which, in his view, violated the preclusion order. Motion to Bar Retrial, 12/7/2023, 13. While conceding that he did not seek a mistrial or even object to these comments, Kujawa alleged that ADA Perchinski was "aware that [Trooper] Bierzonski had difficulty following the [c]ourt's directive at the first trial, was in position to easily anticipate that the same parameters would be in place at the second trial, and had ample time to prepare" him for his testimony. *Id.* ¶ 26.

Returning to the instant charges, Kujawa asserted that Trooper Bierzonski "blatantly violated the [c]ourt's directive by stating that his

investigation involved two girls," *id.* ¶ 24, and those comments "were the product of [ADA Perchinski]'s recklessness in failing to adequately prepare Trooper Bierzonski[.]" *Id.* ¶ 27. Alternatively, Kujawa argued that barring retrial was justified based solely upon Trooper Bierzonski's testimony without any reference to ADA Perchinski's role. *Id.* ¶ 31.

Kujawa argued that barring retrial was particularly warranted because the Commonwealth now had advance knowledge of his strategy. Relevantly, ADA Perchinski had argued in opening statements that E.K. had no motive to fabricate the allegations. As previously recounted, however, Kujawa confronted E.K. with text messages that "neither she, nor the Commonwealth, knew was in the undersigned's possession." *Id.* ¶ 22. According to Kujawa, her "raw answers and demeanor ... were invaluable to the jury's determination on her credibility," *id.* ¶ 23, and indirectly suggested that the Commonwealth would be in a better position at a retrial since it could anticipate the same strategy.

The trial court held a hearing on February 7, 2024, at which ADA Perchinski and Trooper Bierzonski testified. Trooper Bierzonski confirmed that ADA Perchinski informed him that he was to limit his testimony to the specific victims in their respective trials. The trial court added, "In fact, in the case before me, I stated that in open court before the trial began. Do you recall that?" N.T., 2/7/2024, at 5. Trooper Bierzonski acknowledged that he was present. *Id.* The Commonwealth asked him, "When you responded to [ADA Perchinski's] question and referenced two girls, what was your intention in

responding that way?" *Id.* He replied, "To tell the truth, the whole truth, and nothing but the truth." *Id.* The Commonwealth followed up by asking, "Did you intend to reference C.R. when you said two girls?" *Id.* at 5-6. He said, "No, I did not," and also stated that he did not believe his answer violated the pretrial order. *Id.*

The trial court interjected, requesting more details about the specific answer. The trooper then reviewed the offending remark and stated, "I did not refer by names or refer to them as victims at that point, or at any point, in my answer." *Id.* at 7. The trial court repeated the answer and pressed for an explanation:

> THE COURT: Now, how does that not make reference to the second girl that was allegedly assaulted in this case?
>
> [TROOPER BIERZONSKI]: Your Honor, when I was told that information, I didn't know what the truth was or any --
>
> THE COURT: You didn't know what it was then, but you knew that it was when you were sitting there when this trial was taking place because I told you not to mention that other case.
>
> [TROOPER BIERZONSKI]: And that's why I was trying to answer the question the whole truth and nothing but the truth. This is how it was explained to me by my current crime supervisor, and that's why I did not reference names or refer to any of the girls, either one, as a victim. That's why I went on to mention that another patrol member actually handled the initial report, so I was not involved in the process until much later when it was reassigned to me. So that's what I was doing, Your Honor, when I answered the question how did you first become aware of the allegations against [ ] Kujawa involving [E.K.].
>
> THE COURT: Tell me your thought process and how you thought a reference to an incident that occurred with two girls would not somehow prejudice this jury?

TROOPER BIERZONSKI: Because I'm answering the question truthfully. I'm not censoring the truth, because I feel like if I don't tell the whole truth, that's not honest, and I am up here under oath. Also, I don't believe anyone would think that both girls or a girl were victims based on that statement unless they had prior information that there were two victims.

*Id.* at 8-9. Trooper Bierzonski additionally clarified that he did not think the term "incident" signaled a crime, as the PSP uses that term broadly. "We refer to everything as an incident. We could go to an incident and it could be unfounded, but that's our terminology." *Id.* at 9.

Turning to his preparation for trial, he confirmed that he did not meet with ADA Perchinski in person to discuss the case, as he had been promoted to a barracks approximately four hours away prior to trial. The two, however, spoke on the phone, and ADA Perchinski instructed him not to reference C.R. or mention that another victim was involved. *Id.* at 10-11. They did not specifically discuss the question of how he first became involved in the case. *See id.* at 20 ("We didn't prep that specific question ... I was not provided specific questions[.]").

In her testimony, ADA Perchinski confirmed that she instructed Trooper Bierzonski not to mention C.R. *Id.* at 31. Addressing the question that prompted the mistrial, she testified that she expected him "to say that he received a report from the school and that this triggered his investigation." *Id.* She explained that she did not specifically go over certain questions because the order was "very clear," and she spoke with Trooper Bierzonski before trial to remind him not to mention the other incident or any other victims. *Id.* at 37. Moreover, her practice is not to "rehearse specific

- 10 -

questions ... because I think that sets up inappropriate coaching" and opens the door to defense arguments that the witnesses practiced their answers with the prosecutor. *Id.* at 39. Like Trooper Bierzonski, she did not believe that his answer necessarily violated the order, as victims often "report with a friend, with a loved one, with a family member, and it's two people going to report." *Id.* at 38. The trial court pointed out that the answer stated, "[a]n incident occurred with two girls ... not two girls came to report an incident." *Id.* ADA Perchinski replied that she did not believe that the trooper intended to convey two victims were involved and that his answer was careless.

The trial court granted the motion and issued a Rule 1925(a) opinion without ordering the Commonwealth to file a concise statement of matters complained of on appeal. In its opinion, the court stated that it found ADA Perchinski recklessly failed to adequately prepare Trooper Bierzonski for trial. The trial court further noted its concern that Trooper Bierzonski still believes that his answer did not violate the order. See Trial Court Opinion, 8/5/2024, at 6-7 ("Incredibly, he claimed that he was not violating the order[.]"). The court found that he "did not intend to cause the mistrial," but it "result[ed] from ADA Perchinski's failure to properly prepare him for the necessities of this case." *Id.* at 9. According to the trial court, her "failure to prepare ... as well as [Trooper Bierzonski]'s deliberate indifference to our order, amounted to recklessness barring a retrial under ... *Johnson*[.]" *Id.* In light of the preclusion order, the court found that ADA Perchinski "was under the obligation to prevent the presentation of any such evidence. This meant that

she needed to *prepare* her case, including her witnesses." *Id.* at 12 (emphasis in original).

In so holding, the trial court focused on the fact that the trooper immediately violated the order in response to a basic question. *See id.* ("Had she done simple preparation by asking the threshold question regarding the [t]rooper's involvement in this case, she would have been alerted to his improper answer."). The court criticized ADA Perchinski's practice of not rehearsing, opining that this meant "she was prepared to risk a mistrial rather than prepare her witnesses." *Id.* at 12 n.28. Relatedly, the court expressed frustration that Trooper Bierzonski testified that his duty was to tell the whole truth in his answers and "would not generalize the truth to comply with the order." *Id.* at 13. "We found that his attitude showed deliberate indifference to our order." *Id.*

The court determined that it was "up to the ADA to dispel that belief and to bring his proffered testimony into compliance" with the preclusion order. *Id.* On this point, the trial court emphasized that the existence of a specific pretrial order distinguished these circumstances from one "where a ... witness simply slips up where there was no proper guidance." *Id.* Furthermore, the trial court pointed to Trooper Bierzonski's wiretap testimony at the trial concerning C.R. as an alleged victim, finding that he "had to be steered away from violating the preclusion order in that case," which the court believed to be a "red flag" in terms of preparing for this trial. *Id.*

The trial court concluded that ADA Perchinski's failure to prepare "manifested a conscious disregard for the known and substantial risk of a mistrial. That conduct effectively caused [Kujawa] to be denied a fair trial." **Id.** at 15. Additionally, it found that Kujawa would be prejudiced by a retrial, as many of the text messages presented on cross-examination were unknown to the Commonwealth. The trial court observed that the cross-examination "tended to suggest a motive" for E.K. "to describe a consensual encounter as 'rape' if she wanted to continue her relationship with her girlfriend," which the Commonwealth was previously unaware, and could now "adjust its theory of the case" upon retrial. **Id.** at 14-15.

The Commonwealth now appeals as of right from the order, **see** Pa.R.A.P. 311(a)(6), raising one issue for our review: that the trial court "erred as a matter of law by finding that the prosecutor engaged in reckless conduct that invoked double jeopardy protections and barred retrial[.]" Commonwealth's Brief at 8.

### Parties' Arguments

The Commonwealth argues that ADA Perchinski's conduct was negligent at worst and the remedy should be a retrial, not discharge. **Id.** at 22, 29-40. It distinguishes this case from **Johnson**, quoting that Court's multiple references to how severe the prosecutorial and investigative errors were in that case. **Id.** at 25-30 (citing **Johnson**, 231 A.3d at 827 (describing the prosecutor's errors as "unimaginable")). Additionally, that case "encompassed errors that occurred over time," while here "there was one

response that arguably violated" the preclusion order. *Id.* at 29. The Commonwealth also focuses on the form of the question: ADA Perchinski did not ask if there was more than one victim, and the question did not call for any narrative elaboration. The Commonwealth maintains that the trooper's answer, while unfortunate, did not affect Kujawa's "ability to have a full and fair trial." *Id.* at 32. Even if ADA Perchinski made a mistake, "[t]he trooper's testimony, even if construed to be a violation of the pretrial ruling, was not intentional and did not prejudice the defendant or create a disadvantage to the defendant during the trial." *Id.* at 35.

Further, the Commonwealth argues that, to the extent the trial court based its finding of prosecutorial recklessness in any part on ADA Perchinski's failure to appreciate that Trooper Bierzonski had come close to violating the preclusion order during the C.R. matter, this was error. *Id.* at 28. It notes that the Trooper's comments were in response to defense questioning and that "[i]t is unclear how questions from the defense attorney can be intertwined with the prosecutor's alleged conduct at a second trial to support the finding of misconduct." *Id.* Additionally, the Commonwealth observes that Kujawa never moved for a mistrial nor objected to the trooper's testimony at the prior trial. *Id.*

Finally, the Commonwealth argues that its ability to respond to the defense strategy on retrial is not the type of "prejudice" a court may examine within the meaning of *Johnson*. The Commonwealth maintains that the focus

must be on "how the actions (or inactions) of the prosecutor affected the defendant's ability to have a full and fair trial." *Id.* at 32. "Preventing the defendant from ambushing the Commonwealth with a text message at a future trial may be an unfortunate result of defense counsel's request for the mistrial, but it does not prevent the defendant from having a full and fair second trial." *Id.* On this point, the Commonwealth argues that the question and response "did not prejudice [Kujawa]" because the trooper's response "did not directly or indirectly refer to the victim C.R., or even specify that the other girl was also a victim." *Id.* at 31.

Kujawa's argument largely focuses on the prejudice component, agreeing with the trial court's conclusion that the "mistrial resulted in 'extreme prejudice,'" because the Commonwealth now knows his strategy for impeaching E.K. Kujawa's Brief at 18. Kujawa assesses the prejudice necessary "in terms of a retrial" and not whether the trooper's remark itself caused any form of prejudice at the trial itself. *Id.* at 28.

Turning to the offending remark, Kujawa emphasizes Trooper Bierzonski's comment during the C.R. trial, which "stood as a red flag" regardless of whether it was "grounds for a mistrial or not." *Id.* at 19. He reasons that this put ADA Perchinski on notice that Trooper Bierzonski was likely to violate the preclusion order and submits that this awareness is relevant to whether ADA Perchinski consciously disregarded a substantial risk that Trooper Bierzonski would again violate the order and thus prompt a

mistrial. *Id.* at 26. He therefore agrees with the trial court that it was incumbent upon ADA Perchinski to prepare the trooper for trial, and she "consciously chose to bypass basic witness preparation" that could have prevented the offending remark. *Id.* The failure to prepare in light of the known risks "cannot be chalked up to mere negligence under the circumstances of this case." *Id.* Kujawa argues that this case "did not involve a spontaneous error that occurred in the heat of trial. The error ... was preventable by basic preparation that could have occurred at any time" in the months before trial. *Id.* at 20. Kujawa maintains that there is a significant difference between "an inadvertent courtroom mistake, as opposed to a foreseeable mistake preventable by basic preparation." *Id.* at 22.

## Double Jeopardy

Both the Pennsylvania and United States Constitutions protect a defendant from being tried twice for the same offense. U.S. CONST. amend. V (stating no person shall "be subject for the same offence to be twice put in jeopardy of life or limb"); Pa. CONST. Art. I, § 10 (stating "no person shall, for the same offense, be twice put in jeopardy of life or limb"). There is a "valued right to have [a] trial completed by a particular tribunal," *Wade v. Hunter*, 336 U.S. 684, 689 (1949), and a mistrial can, in some circumstances, bar a subsequent trial. *See, e.g., Johnson*, 231 A.3d at 826. Those instances, however, are the exception, as "retrial is generally allowed where the first proceeding ends in a mistrial." *Id.* at 819.

A retrial generally does not implicate double jeopardy concerns when the defendant requests the mistrial. "[A] motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." **United States v. Dinitz**, 424 U.S. 600, 607 (1976) (citation omitted). The High Court addressed the exceptions to that general rule in **Oregon v. Kennedy**, but it acknowledged that "the precise phrasing of the circumstances which *will* allow a defendant to interpose the defense of double jeopardy to a second prosecution where the first has terminated on his own motion for a mistrial have been stated with less than crystal clarity in our cases[.]" **Oregon v. Kennedy**, 456 U.S. 667, 673 (1982) (emphasis in original). In an effort to abate this confusion, the **Kennedy** Court held that, under the federal constitution, the circumstances in which a "defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." **Id.** at 679.

Our Supreme Court rejected **Kennedy**'s limited interpretation as inconsistent with Article I, Section 10 of the Pennsylvania Constitution in **Commonwealth v. Smith**, 615 A.2d 321 (Pa. 1992). In **Smith**, the defendant had been sentenced to death following a jury trial, and the Supreme Court ordered a new trial based upon the erroneous admission of hearsay by an alleged co-conspirator. **See id.** at 322. Before the retrial, Smith learned

that the Commonwealth "withheld potentially exculpatory physical evidence during his first trial and that the Commonwealth knowingly denied the existence of the agreement that existed with its chief witness whereby the witness received favorable sentencing treatment in exchange for his testimony" against Smith. *Id.*

Smith argued that retrial was barred under these circumstances, and our Supreme Court agreed. The *Smith* Court expressed uncertainty whether the *Kennedy* test would bar retrial, noting "it is possible that some courts would not view the prosecutorial misconduct in this case as rising to the level of subversion of constitutional rights." *Id.* at 325. The Court concluded it did not need to decide that point, however, as "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.*; *see also Commonwealth v. Martorano*, 741 A.2d 1221, 1223 (Pa. 1999) (holding that the *Smith* standard was "deliberately nonspecific, allowing for any number of scenarios in which prosecutorial overreaching is designed to harass the defendant through successive prosecutions or otherwise deprive him of his constitutional rights").

*Johnson*, also a capital case, expanded the *Smith* holding by extending double jeopardy protections to scenarios in which the prosecution committed

"misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result." *Johnson*, 231 A.3d at 826 (noting that this basis to bar to retrial "is in addition to the behavior described in *Smith*, relating to tactics specifically designed to provide a mistrial or deny the defendant a fair trial").[4]  The *Johnson* Court clarified, however, that only misconduct that is sufficiently egregious to be classified as prosecutorial overreaching will allow a defendant to invoke double jeopardy, and even "situations involving serious prosecutorial error" will not always bar retrial. *Id.* at 822, 826.

In so holding, the Court highlighted the difference between mere prosecutorial errors, which are "an inevitable part of the trial process," and prosecutorial overreaching, which is not. *Id.* at 824 (citation and internal

---

[4]  In *Johnson*, the key evidence linking Johnson to a murder was a red baseball cap which had DNA in its sweatband.  "[T]he Commonwealth proceeded on the understanding that there was only one baseball cap involved – the red one – and that it contained both [the victim]'s blood and [Johnson]'s DNA." *Johnson*, 231 A.3d at 811.  Post-conviction proceedings established that there were two hats, with the red one having Johnson's DNA and a separate black cap containing the victim's blood.  "[N]either cap had DNA from both individuals." *Id.*  The lead investigator testified that he observed the red cap with fresh blood underneath the brim. *Id.* at 812.  That testimony was false and later revealed to be based on an assumption. *Id.* at 814.  "Although separate property receipt numbers had been assigned to the two hats, this did not prompt the Commonwealth to investigate whether its trial witnesses were discussing two distinct caps[.]" *Id.*  While "these acts and omissions were not made intentionally or with a specific purpose to deprive [Johnson] of his rights, the record is likewise consistent with [the trial court]'s characterization that such mistakes were 'unimaginable.'" *Id.*

quotation marks omitted). Unlike prosecutorial error, "overreaching signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice." *Id.* (citation omitted). The *Johnson* Court noted that there is an "overreaching prerequisite" to any finding that prosecutorial misconduct bars a retrial on double jeopardy grounds. *Id.* (internal quotation marks omitted).

We recognize, as did the Court in *Kennedy*, that the "overreaching" standard is somewhat amorphous, which is why the *Kennedy* Court jettisoned it for purposes of the federal constitution. *See Kennedy*, 456 U.S. at 675 ("The 'overreaching' standard applied by the court below and urged today by Justice STEVENS, however, would add another classification of prosecutorial error, one requiring dismissal of the indictment, but without supplying any standard by which to assess that error."). Our Supreme Court's decision in *Commonwealth v. Starks*, however, aptly summarized the types of misconduct qualifying as "overreaching":

> The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

*Commonwealth v. Starks*, 416 A.2d 498, 500 (Pa. 1980) (citations omitted).

To determine whether a "breakdown of the integrity of the judicial proceeding" occurred, *Johnson* states that the proper inquiry is whether, at the time the mistrial is granted, the judicial proceeding was so tainted that a fair adjudication could not take place:

> When the government engages in improper actions sufficiently damaging to undercut the fairness of a trial, it matters little to the accused whether such course of conduct was undertaken with an express purpose to have that effect or with a less culpable mental state. Either way, the conduct imposes upon the defendant the very "Hobson's choice" which double jeopardy seeks to prevent.

*Id.* at 826. (citation omitted); *see also Kennedy*, 456 U.S. at 670 (forcing a defendant to make a "Hobson's choice" flouts double jeopardy protections because the defendant is forced to either "accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time").

Additionally, in *Commonwealth v. Krista*, we provided examples of prosecutorial overreaching:

> Examples of overreaching, in addition to the farcical string of errors and omissions in *Johnson*, are the prosecution's "consistently making reference to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and ... repeatedly insisting that there was fingerprint evidence linking [the defendants] to the crime when the prosecutor knew for a fact that no such evidence existed," ... *Martorano*, ... 741 A.2d [at] 1223; and contacting a defense witness to intimidate her and prevent her from testifying, [*Commonwealth v.*] *Byrd*, [209 A.3d 351,] 359 [(Pa. Super. 2019)]. In such scenarios, it is clear that the prosecutor made conscious decisions, be they intentional malfeasance or a failure

to heed red flags signaling an unintentional error, to place getting a favorable verdict ahead of the defendant's rights.

*Commonwealth v. Krista*, 271 A.3d 465, 473–74 (Pa. Super. 2022).

## Analysis

We now address whether the trial court correctly ruled as a matter of law that ADA Perchinski's conduct is encompassed by the *Johnson* holding. "An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary." *Commonwealth v. Sanchez*, 262 A.3d 1283, 1288 (Pa. Super. 2021) (citation omitted). Our standard of review over this question is de novo. *Id.* To the extent that factual findings are encompassed within the double jeopardy ruling, we defer to those findings. *Id.*

As discussed above, *Johnson* requires that prosecutorial conduct constitute "overreaching" for double jeopardy to bar retrial. Thus, to affirm the bar to retrial on double jeopardy grounds, it is not enough to find that ADA Perchinski recklessly failed to fully prepare Trooper Bierzonski for compliance with the preclusion order or even that ADA Perchinski's failing was intentional; instead, pursuant to *Johnson*, the prosecution's misconduct must have been truly egregious to the point of outrageous. *See Johnson*, 231 A.3d at 822 ("In spite of the broader protections reflected in *Smith* and *Martorano*, later case law clarified that not all intentional misconduct is sufficiently egregious to be classified as overreaching and, as such, to invoke the jeopardy bar."); *see also id.* at 824 (the Court recognizing that it must "not … lose sight of

- 22 -

the distinction between prosecutorial error and prosecutorial overreaching"). We are also mindful that "dismissal of charges is an extreme sanction that should be imposed sparingly and ... only in cases of blatant prosecutorial misconduct." **Commonwealth v. Burke**, 781 A.2d 1136, 1144 (Pa. 2001) (citation omitted). Based upon our review of the record, we find it clear that this standard is not met here.

The trial court's conclusion that double jeopardy protections precluded Kujawa's retrial appears to rest largely on the fact that the parties agreed to the terms of the preclusion order, which stated that a mistrial could result if violated. Thus, in the trial court's view, ADA Perchinski should have adequately prepared the trooper to testify, especially in light of his testimony at the C.R. proceeding.[5] We accept for purposes of our disposition that the trial court may, as part of its wide latitude to control the proceedings, anticipatorily authorize a remedy for violations of its orders (here, a mistrial). It does not follow, however, that a violation of the preclusion order, no matter

_____

[5] It is not clear if the trial court determined that the trooper's testimony at the C.R. trial was a necessary component of its recklessness finding or whether it was simply evidence tending to show recklessness. We observe, however, that there was no violation of the preclusion order at the trial involving charges related to C.R. To the contrary, the trooper took pains to avoid mentioning E.K. or the additional investigation that was occurring in response to repeated questioning by the counsel for Kujawa—questioning that could be interpreted as goading the trooper to violate the preclusion order and would not be chargeable to the prosecution. **See** N.T., 7/19/2022, at 43-45; **see also, e.g., Commonwealth v. Bonace**, 571 A.2d 1079, 1083 (Pa. Super. 1990) (affirming trial court's denial of defense request for a mistrial as the inadmissible evidence testified to by the trooper was elicited by defense counsel and was a fair response to the question posed).

the scale, necessarily means that Kujawa can never be retried. *See Johnson*, 231 A.3d at 826. To the contrary, on the record before us, there is no basis to find that ADA Perchinski's conduct of asking a single introductory question, coupled with the answer given by Trooper Bierzonski, either caused Kujawa to be denied a fair trial or created a substantial risk of an unfair trial.

The answer provided by Trooper Bierzonski, on its face, does not readily inform the jury that there were two victims. *See* N.T., 12/6/2023, at 100-01 ("there had been an incident that occurred with two girls from a school that had reported some information to a mandatory reporter"). Nor does the question itself invite an answer identifying two victims. *See id.* at 100 ("How did you first become aware of the allegations against [ ] Kujawa involving [E.K.]?"). In fact, the question was clearly limited to the allegations involving E.K. The trial court's concern that the trooper's answer stated, "[a]n incident occurred with two girls ... not two girls came to report an incident," N.T., 2/7/2024, at 38, is well understood. But that analysis suggests that the answer, "two girls came to report an incident" would have been acceptable and would not constitute overreaching. That we must engage in this kind of fine parsing alone suggests that there is no overreaching; the conduct identified by the *Krista* Court and that occurred in *Johnson* are so over-the-line that their prejudicial effect is immediately apparent.[6]

---

[6] Furthermore, if we are to scrutinize each word, we note that the trooper's answer referred to a singular "incident" and not plural "incidents."

The trooper's relatively benign reference did not present Kujawa with a clearly tainted jury, nor was ADA Perchinski's question designed to secure a mistrial or posed in bad faith to prejudice or harass Kujawa. *See Starks*, 416 A.2d at 500. Thus, even accepting that ADA Perchinski was reckless in asking the question as to how law enforcement became involved in this matter without first rehearsing it with her witness,[7] there was no overreaching as there was no breakdown in the integrity of the judicial proceeding and no incurable taint to the jury such that a reliable adjudication could not occur. *See id.*; *Johnson*, 231 A.3d at 826.

Indeed, neither the trial court's opinion nor Kujawa's brief address how this exchange was so out of bounds that it substantially risked Kujawa being denied a fair trial. Instead, both the trial court and Kujawa mainly direct their arguments to how the mistrial will cause prejudice at the ensuing retrial, concluding that retrial must be barred because the Commonwealth is now aware of Kujawa's strategy of attacking E.K.'s credibility. The primary difficulty with this theory is that it entirely omits consideration of whether the

---

[7] The trial court did not focus on the question as asked, as the court premised the recklessness on ADA Perchinski's failure to review the specific introductory question with the trooper ahead of time. Because we determine that there was no prosecutorial overreach, we need not discuss this aspect of the case in detail. We note, however, that we are highly skeptical that the double jeopardy clause can be read to micromanage the way a prosecutor prepares his or her witnesses. *See Johnson*, 231 A.3d at 827 n.14 ("For double jeopardy purposes, unfairly prejudicial statements by witnesses generally are not chargeable to the prosecuting attorney … ."). ADA Perchinski's question was facially vanilla.

Commonwealth overreached, which, as discussed, is a necessary prerequisite to precluding retrial on double jeopardy ground. *See Johnson*, 231 A.3d at 824. Our determination in that regard is dispositive and requires reversal of the trial court's order.

### Conclusion

In sum, we conclude that this case is one of prosecutorial error, not overreaching. As such, we reverse the decision of the trial court that barred retrial of Kujawa as to the allegations concerning E.K. and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/25/2025