J-A06020-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT STERLING MILLER | : | |
| | : | |
| Appellant | : | No. 567 WDA 2025 |

Appeal from the Judgment of Sentence Entered April 14, 2025
In the Court of Common Pleas of Greene County Criminal Division at
No(s):  CP-30-CR-0000203-2023

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                **FILED: April 8, 2026**

Robert Sterling Miller (Appellant) appeals from the judgment of sentence entered following his conviction, by a jury, of one count each of deceptive business practices, theft by unlawful taking, and theft by receiving stolen property.[1]  After careful consideration, we affirm.

The trial court summarized the history underlying this appeal as follows:

[Appellant's] convictions stem from events that occurred when Spencer Williams [(Mr. Williams)], the victim, purchased a 2016 Ram Pro[M]aster van [(the van)] from an online auction [site, Copart,] located in Southwestern Pennsylvania.  [This occurred in August of 2022.]  Mr. Williams was and is a resident of the state of Oregon.  [Mr. Williams] contacted [Appellant] to pick up the van from the auction.  [Appellant] is a mechanic and had an automobile repair business in Greene County, Pennsylvania.  In addition to picking up the van, [Mr. Williams] asked [Appellant] to inspect and repair the van in anticipation of driving it to Oregon.

---

[1] **See** 18 Pa.C.S.A. §§ 4701(a)(2), 3921(a), 3925.

Both [Mr. Williams] and [Appellant] testified at trial. [Appellant] admitted to selling the van to a junkyard for $2,600.00. [Mr. Williams] testified at trial and indicated that this was without his permission. [Appellant] simply said he had the permission of the owner to sell the van. [Appellant] basically testified that he could not repair [Mr. Williams's] van. [Appellant] had no documents that supported his claim and the title to the van remained in [Mr. Williams's] name when it was sold for parts. The van was never recovered.

Trial Court Opinion, 5/5/25, at 2.

Following a one-day trial, a jury convicted Appellant of the above-described charges.[2] On April 14, 2025, the trial court sentenced Appellant to an aggregate 21-42 months' incarceration. Appellant filed post-sentence motions, which the trial court denied on May 5, 2025. Thereafter, Appellant timely filed the instant appeal. The trial court did not direct Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court instead relied upon its opinion in support of its order denying Appellant's post-sentence motions.

Appellant presents the following issues for our review:

I.    Was the verdict, as it pertains to the conviction of deceptive business practices, theft by unlawful taking, and receiving stolen property, [unsupported by sufficient] evidence?

II.   Was the denial of Appellant's counsel's motion to dismiss pursuant to the 6th Amendment of the United States Constitution and Rule 600 of the Constitution of the Commonwealth of Pennsylvania an abuse of discretion?

_____

[2] The jury acquitted Appellant of one count of theft by deception, 18 Pa.C.S.A. § 3922(a)(1).

III. Was the verdict, as it pertains to the conviction of deceptive business practices, theft by unlawful taking, and receiving stolen property, against the weight of the evidence?

IV. Was the sentence, as it pertains to the conviction of [deceptive business practices, theft by unlawful taking, and receiving stolen property,] an abuse of discretion?

Appellant's Brief at 5 (issues reordered; capitalization modified).

Appellant first challenges the sufficiency of the evidence underlying his conviction. *Id.* at 21. In his statement of facts, Appellant claims that Mr. Williams presented inconsistent testimony. *Id.* at 7. Appellant asserts that, although Mr. Williams testified he spoke with Appellant on one occasion, Mr. Williams also testified that he spoke with Appellant by telephone multiple times. *Id.* According to Appellant, Mr. Williams testified that Appellant told him the van was fine, but Mr. Williams contradicted himself, stating that Appellant "did in fact inform him about multiple significant mechanical issues with the van, including text message conversations that were presented at trial.[3] *Id.* at 8.

Appellant argues "it is clear from the testimony presented that conversations concerning Appellant working on Mr. [Williams's] recently

_____

[3] Appellant claims that when he examined the van, "a number of issues were discovered." *Id.* at 11. According to Appellant, a number of wires under the dash "were cut[,]" which would indicate "this was likely a company van and prior to the auction, the company removed the computer." *Id.* at 12. Appellant points to his testimony explaining that without the computer, the van could not communicate properly with the transmission, which caused the van to go into "limp" mode. *Id.*

- 3 -

purchased [] van occurred." *Id.* at 23. Appellant maintains he informed Mr. Williams regarding the mechanical issues with the van, and told Mr. Williams that the van was not street operable. *Id.* Appellant claims he informed Mr. Williams regarding issues with the title of the van. *Id.*

Appellant points out that he was not paid for his storage of the van or for the work performed on the van. *Id.* According to Appellant, "[t]he only dispute between Mr. Williams and [] Appellant is whether or not Mr. Williams told Appellant he could keep the van to cover his costs[,] or if [] Appellant took the van and sold it without Mr. Williams'[s] permission." *Id.* at 23-24.

Appellant emphasizes that the jury acquitted him of the charge of theft by deception, and argues that his acquittal "was a clear indication of insufficient facts to convict [] Appellant of a theft charge." *Id.* at 25. Appellant contends that the offense of theft by deception has the same material elements as the crimes of deceptive business practices, theft by unlawful taking, and theft by receiving stolen property. *Id.* Appellant argues that his acquittal of theft by deception necessitates a conclusion that the evidence was insufficient as a matter of law to sustain his remaining convictions. *Id.*

> The standards governing sufficiency review are well settled:
>
> In conducting sufficiency review, we consider whether the evidence introduced at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the elements of the offense beyond a reasonable doubt. Our review does not involve reweighing the evidence and substituting our

judgment for that of the fact-finder. In addition, the facts and circumstances need not be absolutely incompatible with the defendant's innocence; rather, the question of any doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Muhammad***, 335 A.3d 1047, 1051 (Pa. 2025) (citation omitted). "[T]he uncorroborated testimony of a single witness is sufficient to sustain a conviction for a criminal offense, so long as that testimony can address and, in fact, addresses, every element of the charged crime."

***Commonwealth v. Johnson***, 180 A.3d 474, 481 (Pa. Super. 2018).

The Crimes Code defines the crime of deceptive business practices as follows:

**(a) *Offense defined.* —** A person commits an offense if, in the course of business, the person:

….

**(2)** sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service[.]

18 Pa.C.S.A. § 4107(a)(2).

A person is guilty of theft by unlawful taking "if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." ***Id.*** § 3921(a).

A person is guilty of theft by receiving stolen property

if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

- 5 -

*Id.* § 3925(a). The term "receiving" is defined by the statute as "acquiring possession, control or title, or lending on the security of the property." *Id.* § 3925(b).

Our review discloses that at trial, the Commonwealth first presented the testimony of Mr. Williams. Mr. Williams testified that he lives in Oregon. N.T., 1/30/25, at 27. Mr. Williams explained that he purchased the van on Copart, an online auction website. *Id.* at 28. According to Mr. Williams, he paid "around the ballpark of $12,900" to purchase the van. *Id.* at 67. Mr. Williams testified that Copart represented that the van's ignition worked; the van could start; and "everything works in order for it to accelerate … and stop properly." *Id.* at 32.

When Mr. Williams discovered the van's location in Pennsylvania, he contacted a friend in Pennsylvania, Chris Rush (Rush), who is the nephew of Appellant's girlfriend. *Id.* at 31. According to Mr. Williams, Rush recommended Appellant to

> help you tune up the [] van so that way you can drive it back to Oregon from Pennsylvania without worrying about it breaking down.

*Id.*

Mr. Williams testified that he continuously had difficulty contacting Appellant:

> [W]henever I'd try to call his shop, he was conveniently never able to talk to me on the phone. And there was one of his workers or associates that would say, "Oh … he just left," or "Oh, he can't talk right now."

- 6 -

….

> … I believe I may have talked to [Appellant] on the phone, maybe one time, briefly.  But I believe that was when he was going to pick it up just to make sure that all went smoothly.  I believe we may have talked on the phone once, maybe.
>
> ….
>
> I was hoping [Appellant] would just tune it up and then give me a call and say, "Hey, you know, it's ready to drive to Oregon.  You should be good."  And then I was going to fly out there and drive it back.

*Id.* at 33.

Mr. Williams explained that he arranged with Appellant to pick up the van from Copart's lot in Ebensburg,[4] Pennsylvania:

> [Copart] said they needed … some kind of, I want to say code to pick it up.  And they needed … license plates on it or whatever.  So, [Appellant] told me it would be no problem.  He'd go to pick it up ….  [Appellant] had the code[.] … I believe I had to give him the code[,] if I remember correctly.  And [Appellant] … put license plates on it, picked it up, and that was basically the last time I ever heard from him.

*Id.* at 36.

Mr. Williams testified that he had between two or four different conversations with Appellant, "mostly via text."  *Id.* at 35.  Mr. Williams confirmed that Appellant, at first, was receptive to Mr. Williams's text messages, "and then completely ignored me."  *Id.*  According to Mr. Williams,

_____

[4] The notes of testimony mistakenly named the location as "Evansburg." N.T., 1/30/25, at 71.

he repeatedly and unsuccessfully tried to contact Appellant by telephone calls and by text messages. *Id.* at 37. Because he could not reach Appellant, Mr. Williams eventually contacted the police. *Id.* at 34. Mr. Williams testified that Appellant possessed the van for about three weeks. *Id.* at 37.

Mr. Williams believed that Appellant told Cumberland County Police Officer Logan Koller that Mr. Williams "gave [Appellant] the approval to get the [] van junked, which was never the case. I never gave him that approval." *Id.* at 48. Mr. Williams expressly testified that he never gave Appellant approval to do anything other than fix the van. *Id.* at 48-49.

On cross-examination, Mr. Williams conceded he could not recall whether he spoke with Appellant by telephone. *Id.* at 51. Mr. Williams explained, "Honestly, … it's been a while. I'm not a hundred percent sure we ever spoke on the phone. Not a hundred percent." *Id.* Mr. Williams acknowledged testifying that they spoke at least one time about Appellant picking up the van, but stated, "… it was two and a half years ago." *Id.* Mr. Williams stated, "I believe that we spoke on the phone once, but we did a majority of our communication through text." *Id.* at 52.

Mr. Williams testified that he paid $80.00 to Appellant, via the mobile payment service, Cash App, to tow the van to Appellant's shop. *Id.* at 53. Mr. Williams confirmed that Appellant texted him that the van "starts and runs, but it doesn't have any power to move down the road." *Id.* at 59. Mr. Williams agreed that Appellant informed him about significant issues with the

van's operability. *Id.* at 60-61. According to Mr. Williams, Appellant never gave him an estimated cost for repairing the van; "[h]e just stopped messaging me, stopped calling me, and got my [] van junked for no reason." *Id.* at 62. Mr. Williams expressly testified he did not give Appellant permission to "junk" the van. *Id.* at 66. Mr. Williams explained,

> I saved up multiple years, cost me over twelve grand to buy [the van], and [Appellant] said that I gave him permission to junk it for $3,500. Which makes zero sense. Why would I do that[?]

*Id.* at 67. Mr. Williams reiterated that he never gave Appellant permission to sell the van to a junkyard, and he received no funds from Appellant resulting from the sale of the van. *Id.* at 69. Mr. Williams did not believe Appellant's claim that the title was invalid. *Id.* at 68. According to Mr. Williams, Appellant "may have said that, but I don't believe that." *Id.*

The Commonwealth next presented the testimony of Anita Diane Eckenrode (Eckenrode), the general manager of the Copart facility in Ebensburg.[5] *Id.* at 71. As described by Eckenrode,

> Copart is an online salvage auction. What happens is, we do purchase some cars. But the majority of our business is, we pick up wrecked cars for insurance companies, the ones that we have different contracts with. So, we'll send [a] truck out, pick up the cars, bring them in, … clean them up a little bit, get rid of the trash, things like that.
>
> And then we take specific photos of the [vehicle] to advertise the condition that we can see on them. And we post them on our auction [website], and we hold an auction….

---

[5] Eckenrode indicated that the facility is also known as Copart Altoona. N.T., 1/30/25, at 71.

- 9 -

*Id.* at 72-73.

Eckenrode testified that she "verified that the title [to the van] was a legit title." *Id.* at 78. Eckenrode stated that she reviewed the Copart records, which showed the following:

> It [] show[ed] that it was [Mr.] Williams; that … his account purchased the van. And that record shows me his driver's license and the documentation he provided.
>
> It shows that he made a payment to purchase the van, and when he did not pick it up within the specific timeframe, storage [fees] will start for our buyers ….
>
> And the [records] show that [Mr. Williams] made two payments on that storage … before the van was picked up, as well as the scheduled pickup appointment.

*Id.* at 82-83. According to Eckenrode, the sale price was $7,000 for the van itself, and there were "additional fees." *Id.* at 83. Eckenrode stated that Mr. Williams paid Copart approximately $9,068 for the van, which included storage fees. *Id.* at 103. Eckenrode indicated that the van was "in good condition … versus a wrecked van." *Id.* at 90.

Eckenrode identified Commonwealth's Exhibit 5 as the title to the van. *Id.* at 92. Regarding the title, Eckenrode testified that Copart did not have a power of attorney for Mr. Williams. *Id.* at 94. She indicated that whoever came to Copart to pick up the van

> would have had to indicate she [or he] had authorization to sign for it because we would have informed them we cannot sign the title; we do not have power of attorney.

And then whoever was there would have signed the title or said, "Well, I'm not allowed to sign it." If they weren't allowed to sign it, we would have kept the title, and it would have stayed in our file until Mr. Williams decided how he wanted to handle that.

*Id.* Eckenrode confirmed the title had a signature on it by somebody named "Michelle." *Id.* at 95. According to Eckenrode, "[t]his title wouldn't have left our facility until it was signed."[6] *Id.* Our review discloses that on the title, "Michelle"[7] signed the title as co-purchaser. Commonwealth's Exhibit 5. Michelle's signature is notarized. *See id.*

James A. Hoyle (Hoyle) testified that he, his wife, and his son own/operate Hoyle's Auto Yard (Hoyle's). *Id.* at 107. Hoyle indicated he knew Appellant, who "started buying parts off of us." *Id.* at 109. Hoyle testified that on October 29, 2022, Appellant called him to inquire whether Hoyle would be interested in purchasing a van. *Id.* According to Hoyle, he told Appellant, "If we have the title, yes." *Id.* Appellant informed Hoyle that he possessed title to the van. *Id.* Regarding this title, Hoyle testified that Appellant "brought it in, put it on the counter, and I looked at it[.]" *Id.* at 111. According to Hoyle, Appellant told him the title "was signed in the wrong place or something." *Id.* at 113. Hoyle believed that Appellant owned the

_____

[6] A representative of the seller of the auctioned van, LeasePlan USA, properly executed its portion of the title. N.T., 1/30/25, at 97, 99.

[7] The last name appears to be Domiclovich.

- 11 -

van. *Id.* at 115. Hoyle confirmed that when selling the van to Hoyle's, Appellant signed an attestation that stated,

> I certify I am the rightful owner of the van listed below and have permission to sell this van to Hoyle's ….

*Id.* at 118. According to Hoyle, Appellant signed the attestation "right in front of me." *Id.* at 119. Hoyle paid Appellant $2,600 for the van. *Id.* at 120.

Cumberland County Police Sergeant Eric Orr (Sgt. Orr) testified that during the fall of 2022, he contacted Appellant. *Id.* at 132. At that time, Appellant admitted selling the van to Hoyle's. *Id.* Appellant informed Sgt. Orr that

> the van itself was apparently going to cost more to fix than it was worth. I think it was … a computer issue or something like that. And that [Appellant] had spoke[n] with Mr. Williams and that a mutual agreement had been made to scrap the van to cover … the cost that Mr. Williams owed.

*Id.* at 133.

Appellant testified on his own behalf. Appellant explained that in September-October 2022, he was working at MM Auto Service. *Id.* at 140. Around that time, Mr. Williams contacted Appellant. *Id.* at 141. According to Appellant, Mr. Williams

> said he bought a van from Copart and wanted it checked out to make sure everything was good to go. And he was going to fly in to visit some family he had in Pennsylvania, and pick it up, and drive it back.

*Id.* Appellant testified that Mr. Williams wanted Appellant to "[g]o pick it up and check it out." *Id.*

Appellant testified that two friends "that hung around the garage," "Michelle and Charles," picked the van up for him. *Id.* at 143. Appellant explained that "they ran parts for me, … [and] did little things." *Id.* He confirmed that it is Michelle's signature on the title. *Id.* at 143-44. Appellant stated that Michelle and Charles retrieved a car trailer from his shop to tow the van, because the van was not operable. *Id.* at 145.

Appellant testified that upon examining the van, he discovered it had "a bad inner tire rod end. And the company who had it before[,] … I think they had a [global positioning system] wired into it because it was a company van." *Id.* at 145-46. Upon further examination, Appellant found that "[t]he computer was bad." *Id.* at 146. Appellant explained that "you can drive [the van] for, probably, a quarter mile." *Id.* at 147. After that, it would go into "limp mode" or a low-power mode. *Id.*

Appellant testified that he told Mr. Williams about these issues, and Mr. Williams asked for the cost of repairs. *Id.* at 148. Appellant stated he then called Solomon's Dodge dealership, but the dealership refused to work on the van based on a problem with the title. *Id.* Specifically, Appellant noticed that "Michelle signed it where [Mr. Williams] was supposed to sign it[.]" *Id.* at 149. Appellant confirmed his interaction with the Dodge dealership ended at that point. *Id.* Appellant explained, "if you can't get it registered real quick, there's no use of getting it fixed and then letting it sit there." *Id.* at 150. Appellant testified he relayed this information to Mr. Williams. *Id.*

Appellant claimed he had four or five additional conversations with Mr. Williams by telephone. *Id.* at 151. Appellant stated that in one of those conversations, he told Mr. Williams to contact Copart to get a duplicate title, and Mr. Willliams agreed to do that. *Id.* A couple of days later, Appellant contacted Mr. Williams and inquired about the van's status. *Id.* at 152. At that time, Mr. Williams stated he had contacted Copart, which was unable to assist him. *Id.* at 152-53. When Mr. Williams asked what he should do, Appellant suggested that Mr. Williams "could get a car hauler and have it hauled out to you, and you can decide what to do with it then." *Id.* at 153. Mr. Williams responded that he would check into it. *Id.* at 154.

Mr. Williams subsequently told Appellant that he "can't have a vehicle that's not registered parked at [Mr. Williams's] house … or it would get towed by the city." *Id.* Appellant told Mr. Williams to "[f]igure out what you want to do with it and call me back." *Id.* When Mr. Williams next contacted Appellant, Mr. Williams asked "what … he owed me." *Id.* Appellant responded, around $2,600. *Id.* Appellant testified that this was his cost for repairing the van's wiring harness and the tire rod end, and for transporting the van to his shop. *Id.* at 155. Appellant testified he additionally charged for towing and storage. *Id.* at 167. Appellant acknowledged that Mr. Williams had paid $80 to transport the van, but that only covered gas. *Id.* at 155. Mr. Williams told Appellant to keep the van "for what he owed me, and he was

done with it." *Id.* at 156. Appellant testified he received no further text messages from Mr. Williams. *Id.* at 161.

Appellant thereafter contacted Hoyle. *Id.* at 157. Appellant testified that he personally delivered the van to Hoyle's, and pointed out Michelle's signature on the wrong portion of the title. *Id.* at 158. Appellant confirmed he filled out a bill of sale for the van, and put his name on it. *Id.* at 159. At that time, Appellant believed this was an above-board transaction. *Id.*

On rebuttal, Mr. Williams testified that he never had a conversation with Appellant about the cost to repair the van. *Id.* at 175. Mr. Williams testified,

> [t]he only cost that we discussed was getting it towed—or having him—when he sent the Cash App to have it picked up. That was the only thing.
>
> ….
>
> That was just for his time, his gas, for him to come pick up the [] van and take it to his shop where he could get it properly diagnosed and tune it up.

*Id.* at 175-76. Mr. Williams explained that he didn't know about the van needing to be towed, as Copart had indicated that the van "runs and drives." *Id.* at 176 (capitalization modified). Mr. Williams explained that he has purchased around eight vehicles from Copart. *Id.* at 177. According to Mr. Williams, when Copart says the vehicle "[r]uns and drives," it "usually means that it's … road-worthy. … [I]t means it can accelerate, it can get on the freeway, it can drive like normal." *Id.*

- 15 -

Mr. Williams testified that Appellant's only message regarding the van's condition stated that "there might be a sensor issue, and that it won't accelerate past twenty-five miles per hour, which I believe to be false." *Id.* Mr. Williams denied having conversations with Appellant regarding the van's condition, "because [Appellant] would never answer my phone calls." *Id.* at 178. Mr. Williams further testified that Appellant only vaguely described how he would retrieve the van from Copart. *Id.* According to Mr. Williams, Appellant said,

> "Oh, don't worry. I'm just going to slap a dealer plate on it," and "Don't worry. I [will] have someone drive right behind me—follow me so there's won't be any issue."
>
> … I don't even see how he got it … towed because that was always the plan was [*sic*], he was going to put a plate on it and then have someone follow behind him. Which is what you can see in the text message conversation.

*Id.* Mr. Williams confirmed that Appellant informed him that the van could not be driven. *Id.* at 178-79. Mr. Williams denied that Appellant claimed to be owed $2,600. *Id.* at 180.

This evidence, viewed in a light most favorable to the Commonwealth, as verdict winner, is sufficient to sustain Appellant's conviction of deceptive business practices. Appellant, in the course of business, intentionally delivered less than the servicing of the van, which he had represented to Mr. Williams. *See* 18 Pa.C.S.A. § 4107(a)(2).

Regarding the crime of theft by unlawful taking, the evidence, viewed in a light most favorable to the Commonwealth, established that Appellant

intentionally and unlawfully exercised control over the van with the intent to deprive Mr. Williams thereof. Appellant's intent is evidenced by his subsequent sale of the van to Hoyle without Mr. Williams's consent or permission. ***See id.*** § 3921(a).

Regarding the crime of receiving stolen property, the evidence established that Appellant intentionally retained and disposed of the van, knowing it had been stolen from Mr. Williams. ***See id.*** § 2925(a); ***Commonwealth v. Maldonado-Vallespil***, 225 A.3d 159, 167 (Pa. Super. 2019) (recognizing that "the retention of stolen property is a 'continuing' offense which does not terminate until the stolen property is taken from the accused." (citation omitted)); ***Commonwealth v. Kuykendall***, 465 A.2d 29, 32 (Pa. Super. 1983) (holding, *inter alia*, that a defendant who stole a vehicle and retained it could be convicted of receiving stolen property that he himself had stolen). Thus, the evidence is sufficient to sustain Appellant's convictions.

We further find no merit to Appellant's claim that his acquittal of theft by deception requires entry of judgment notwithstanding the verdict for his remaining convictions. Our Pennsylvania Supreme Court observed the following regarding a jury's inconsistent verdicts:

> The Supreme Court of the United States has recognized that inconsistent verdicts may be founded upon "mistake, compromise, or lenity." In order to ascertain the rationale underlying the inconsistent verdict, a court would be forced to speculate about, or probe into the jury's deliberations, an enterprise which courts generally do not, and should not, undertake.

***Muhammad***, 335 A.3d at 1059 (footnotes omitted) (quoting ***United States***

***v. Powell***, 469 U.S. 57, 65 (1984)).  In its decision, the ***Powell*** Court quoted

Judge Learned Hand's view of inconsistent verdicts:

> The most that can be said in such cases is that the verdict shows
> that either in the acquittal or the conviction the jury did not speak
> their real conclusions, but that does not show that they were not
> convinced of the defendant's guilt.  We interpret the acquittal as
> no more than their assumption of a power which they had no right
> to exercise, but to which they were disposed through lenity.

***Powell***, 469 U.S. at 63 (quoting ***Seckler v. United States***, 7 F.2d 59, 60

(2d Cir. 1925)); ***accord Muhammad***, 335 A.3d at 1059.  Thus, Appellant's

acquittal of theft by deception does not invalidate Appellant's remaining

convictions.

In his second issue, Appellant argues that the trial court improperly

denied his motion to dismiss based upon the Commonwealth's violation of his

constitutional and Pa.R.Crim.P. 600 (Rule 600) right to a speedy trial.

Appellant's Brief at 25.  Appellant claims that he "was charged on two separate

case[s] docketed at 203 [of 2023 (the instant case),] and 204 of 2023 [(an

unrelated case involving a different victim),] which [proceeded] concurrently

up until [] Appellant requested trial on each case." ***Id.*** at 28.  Appellant filed

a Pa.R.Crim.P. 600 motion to dismiss in both cases. ***Id.***  According to

Appellant, the trial court granted the dismissal of case number 204 of 2023,

but denied the dismissal of the instant case. ***Id.***  Appellant states,

> the court's reasoning for the denial was that the mechanical run
> time for [the instant case] was paused on the date a trial request

was made on both cases and therefore, the adjusted [] run time did not expire at the time of [] Appellant's motion to dismiss....

*Id.* at 28-29 (punctuation and capitalization modified).

Appellant argues that he was charged on April 2, 2023. *Id.* at 29. Appellant states that he requested a continuance of the preliminary hearing from April 27, 2023, to May 23, 2023. *Id.* Appellant points out that the Commonwealth requested a continuance of the May 23, 2023, hearing. *Id.* The preliminary hearing ultimately took place on July 26, 2023. *Id.*

Appellant states,

[f]ormal arraignment occurred on August 28, 2023[.] Plea [c]ourt [scheduled for] October 17, 2023, was continued by the Commonwealth. [P]lea court on November 14, 2023, was continued by the Commonwealth. [P]lea court on January 10, 2024 was continued by the defense. And [a] plea court [hearing was held] on March 19, 2024, at which time [Appellant] made [] requests for trial on both cases.

Two pretrial conferences were scheduled with [case number 204 of 2023 scheduled] for April 8, 2024, and this case scheduled for May 17, 2024, with the Commonwealth deciding that the case at 204 of 2023 would have priority in being brought to trial. Jury selection on … 204 of 2023 was set for June 5, 2024, with a trial to begin on June 28, 2024, while a pretrial conference on this matter … was continued by the court to June 14, 2024, and then to July 12, 2024. [In 204 of 2023,] a jury was selected by the Commonwealth and the defense on June 5, 2024. The trial set for June 28, 2024 was continued at the request of the Commonwealth. Prior to [204 of 2023] returning for trial, the case was dismissed pursuant to Rule 600….

*Id.* at 29-30 (capitalization and punctuation modified).

Appellant also challenges the trial court's failure to attribute to the Commonwealth the 169 days between March 19, 2024 (when Appellant made

two trial requests), and September 3, 2024, when the trial court denied his Rule 600 motion to dismiss. *Id.* at 30-31. He asserts "a jury was selected on the case at 204 of 2023, however, the Commonwealth continued that trial prior to its commencement causing further delay to both cases." *Id.* Appellant points out that a second jury was never selected for 204 of 2023. *Id.* at 31-32. Appellant claims that the Commonwealth failed to act with due diligence, and the case should have been dismissed. *Id.*

It is well settled that

in evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the [trial] court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion[,] the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused. The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

*Commonwealth v. Hunt*, 858 A.2d 1234, 1238 (Pa. Super. 2004) (*en banc*) (citations, original brackets, quotation marks, and ellipsis omitted; formatting modified). Additionally,

when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative

mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

*Id.* at 1239 (citation and brackets omitted); *see also Commonwealth v. Selenski*, 994 A.2d 1083, 1088 (Pa. 2010) (stating, "Rule 600 serves to protect a defendant's speedy trial rights, as well as society's right to effective prosecution of criminal cases").

Pennsylvania Rule of Criminal Procedure 600 provides, in relevant part, as follows:

**(A)** Commencement of Trial; Time for Trial

**(1)** For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

**(2)** Trial shall commence within the following time periods.

**(a)** Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

Pa.R.Crim.P. 600(A)(1)-(2).

In calculating whether the Rule 600 prompt-trial requirements have been violated,

a court must first calculate the "mechanical run date," which is 365 days after the complaint was filed, and then must account for any "excludable time[.]" Rule 600 explains the computation of time as follows: "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

… Once the "excludable time" is calculated, this time is added to the "mechanical run date" to produce the "adjusted run date," which is the deadline for the Commonwealth to bring the defendant to trial under Rule 600.

*Commonwealth v. Lear*, 325 A.3d 552, 560 (Pa. 2024) (citations and some internal quotation marks omitted).

As explained in *Lear*,

[T]he first sentence of Rule 600(C)(1) expresses the general rule[.]  Rule 600 establishes two requirements that must be met for delay to count toward the 365-day deadline: (1) the delay must be caused by the Commonwealth; and (2) the Commonwealth must have failed to exercise due diligence. [W]here delay is not caused by the Commonwealth or delay caused by the Commonwealth is not the result of lack of diligence, it must be excluded from the computation of the Rule 600 deadline.[]  The second sentence of Rule 600(C)(1) then explains that "any other periods of delay" - meaning any periods of delay not caused by the Commonwealth or not resulting from the Commonwealth's lack of due diligence - are excludable and are removed from the computation of the Rule 600 deadline.

*Id.* at 560 (citations, original brackets, emphasis, and some quotation marks omitted).  "[T]he causation analysis precedes the due diligence inquiry, and it is only when the Commonwealth both caused the delay and lacked due diligence that the delay is properly included in the Rule 600 calculation." *Id.* at 560-61 n.7.  Thus, the trial court considers only whether the Commonwealth acted with due diligence in those situations in which the trial court first determines that it was the Commonwealth who caused the delay.  *See id.*  When some other factor, such as a factor out of the control of the Commonwealth, caused the delay, the court does not consider the

- 22 -

Commonwealth's due diligence, but rather adds the period of delay to the mechanical run date. *See id.* at 560.

Finally, we recognize that "any delay caused by the need to reschedule a trial because of a continuance attributable to the defense constitutes excludable time, even if the defendant was prepared to go to trial at an earlier date." ***Commonwealth v. Walker***, 331 A.3d 43, 46-47 (Pa. Super. 2025) (quotation marks omitted). With this in mind, we address Appellant's speedy-trial challenge.

Here, the Commonwealth filed its criminal complaint against Appellant on April 6, 2023. Therefore, the mechanical run date for Appellant's trial, under Pa.R.Crim.P. 600, was Friday, April 5, 2024.

The trial court scheduled Appellant's plea hearing for October 17, 2023. However, this hearing was continued, at the request of the Commonwealth, to November 14, 2023. The resulting delay of 28 days is attributable to the Commonwealth and not excludable for Rule 600 purposes.

The November 14, 2023, plea hearing was next continued, at Appellant's request, until January 10, 2024, resulting in an excludable delay of 57 days. Consequently, the adjusted run date became June 1, 2024.

On January 11, 2024, the docket reflects that Appellant had requested a continuance of the plea hearing, which resulted in a delay from January 10, 2024, until March 19, 2024. Thus, an additional 69 days of excludable time

was added to the adjusted run date, resulting in an adjusted run date of August 9, 2024.

On March 19, 2024, Appellant requested a jury trial for both this case and his case docketed at number 203 of 2024. However, as Appellant conceded in his brief, "a pretrial conference on this matter … was continued by the court [from May 17, 2024,] to June 14, 2024[,] and then to July 12, 2024." Appellant's Brief at 30. Because the Commonwealth did not cause this delay, this 115-day period is added to the adjusted run date, resulting in a new adjusted run date of Friday, October 4, 2024. *See Commonwealth v. Johnson*, 289 A.3d 959, 982 (Pa. 2023) ("[J]udicial delay is delay caused by the court, rather than the Commonwealth, and is likewise excludable if the Commonwealth exercised diligence during that time.").

However, in its August 30, 2024, motion to schedule trial, the Commonwealth explained that

> 3. Calculating Rule 600 in this case presents challenges as [Appellant] is also the defendant in the next docketed criminal case, with both cases having the same filing date.
>
> 4. This has also made selecting a trial date difficult as both of [Appellant's] cases cannot be selected from the same jury pool— the [trial c]ourt has noted this fact in its [o]rders of March 19, 2024; April 8, 2024; May 17, 2024; June 14, 2024; and July 12, 2024.
>
> 5. The Commonwealth cannot be faulted for the fact that no trial sessions were held in July or August of 2024.
>
> 6. [Appellant's] other case is scheduled for jury selection on September 4, 2024, and trial has been scheduled for September

26, 2024, thereby preventing this case from being scheduled prior to the estimated run date.

Commonwealth's Motion to Schedule Trial, 8/30/24, ¶¶ 3-6.

The trial court scheduled jury selection for October 2, 2024, before the Rule 600 adjusted run date. However, because Appellant's trial at case number 204 of 2023, was scheduled for the same trial term, both cases would use the same jury pool. The trial court and Appellant agreed to continue the instant case to prevent potential prejudice to Appellant, which might result from using same jury pool. The case at 204 of 2023 was ultimately dismissed on the basis of Pa.R.Crim.P. 600. However, contrary to Appellant's claim, we cannot conclude that Rule 600 requires the dismissal of the instant case.

Here, the trial court explained its reasons for not attributing, to the Commonwealth, the delay caused by the trial court's calendar, and for scheduling Appellant's two unrelated cases for the same jury pool:

Each of the charges related to illegal business practices performed by [Appellant] in his automotive repair business. [Appellant] sought a jury trial on each case. **All parties agreed and it is standard practice to not select jurors for two separate unrelated cases from the same jury pool.**

Case 204 [of] 2023[] was ultimately dismissed by the court on Rule 600 issues. This does not negate delay that remains with [Appellant]. He rightly used Rule 600 as a shield from an untimely prosecution in 204 [of] 2023. At 203 [of] 2023 [(the instant case)], he is not permitted to use the same Rule as a sword to dismiss the above prosecution.

In its September 26, 2024, the [trial c]ourt indicated that the benefit of delay was to [Appellant,] as there were two pending criminal cases, and [the court] determined that it would have been

detrimental to [Appellant] if a single jury pool was informed that [Appellant] was charged with two separate and unrelated crimes.

[Pa.R.Crim.P.] 600 is a codification of a constitutional right to a speedy trial. [Rule 600] require[s] that a trial be held within 365 days of the filing of the complaint[,] with the exception of certain time that is excluded pursuant to the [R]ule and also pursuant to relevant case law.

[The trial court] rightly determined that the delay was attributed to [Appellant,] as delay [in the instant case] resulted due to the pending charges at 204 [of] 2023, and the [trial c]ourt's indication of the detriment to [Appellant] if the [c]ourt were to pick two separate jury panels from the same pool….

Trial Court Opinion, 5/5/25, at 5-6 (emphasis added). We agree with the trial court's sound reasoning, and its conclusion that Appellant's speedy-trial rights were not violated. *See id.*

However, even if the disputed delay was attributable to the Commonwealth, we would not conclude that the Commonwealth acted with a lack of due diligence. We are guided by our reasoning in *Commonwealth v. Metzger*, 375 A.2d 781 (Pa. Super. 1977), which this Court decided under former Pa.R.Crim.P. 1100 (now Rule 600).

In *Metzger*, the trial court, in scheduling the appellant for trial, had available only two criminal terms of court that would meet the speedy trial requirements of former Rule 1100. *Metzger*, 375 A.2d at 783. These trial terms were scheduled for September and November of 1975. *Id.* During the September 1975 trial term, the appellant's brother was tried regarding various drug deals that also implicated the appellant. *Id.*

- 26 -

The Commonwealth, therefore, chose not to bring [the appellant] to trial in September[,] because the county had only one jury pool, members of which had already heard testimony against him at his brother's trial. During the November trial term, the Commonwealth tried [the] appellant on a charge of conspiracy, arising out of one investigation, **but based on a different criminal episode from the offense involved herein**. Thus, the Commonwealth faced the same problem as it did during the September term….

*Id.* (footnote omitted; emphasis added).

In assessing the delay of the appellant's second trial under former Rule 1100, this Court concluded the delay did not result from a lack of due diligence by the Commonwealth:

We do not think that the district attorney was compelled to permit the defendant to choose between a speedy trial and a fair trial. The prosecutor and the court administrator are both responsible for management of the court calendar. The prosecutor must act to ensure that a defendant receive a fair trial; it is his obligation to seek justice, not merely to convict. The prosecutor's concern was well founded. Had the Commonwealth proceeded to trial in September or November, the risk of creating reversible error was great because it was likely that jurors would have been made aware that appellant was involved in multiple prosecutions. For example, in **Commonwealth v. Trapp**, … 272 A.2d 512 ([Pa. Super.] 1970), and **Commonwealth v. McDaniel**, … 268 A.2d 237 ([Pa. Super.] 1970), jurors were aware of a trial list which indicated that the defendant was charged with other offenses unrelated to the case on trial. We found that the potential prejudice resulting from that knowledge warranted a new trial….

*Id.* at 785 (quotation marks and some citations omitted). This Court further concluded that the existence of an alternative procedure, *i.e.*, the individual *voir dire* of each potential juror, "does not preclude a finding of due diligence." *Id.* This Court opined, "We cannot find that the prosecutor failed to exercise

due diligence when the delay engendered was so obviously intended to foster the fair administration of justice." *Id.* at 786.

For the same reason, we would conclude that even if the delay of the trial to the next jury pool was chargeable to the Commonwealth, the delay was not caused by a lack of due diligence by the Commonwealth. Appellant's Rule 600 claim merits no relief.[8]

In his third issue, Appellant claims that the trial court improperly denied his motion for a new trial, based on his challenge to the verdict as against the weight of the evidence. Appellant's Brief at 18. In support, Appellant claims that "[t]he testimony of Mr. Williams was inconsistent and incomplete." *Id.* at 19. Appellant points to contradictions in Mr. Williams's testimony regarding the number of his conversations with Appellant, and Mr. Williams's explanations for these inconsistencies. *Id.* at 19-20. Appellant maintains his own testimony was internally consistent, and consistent with the testimony of the other witnesses. *Id.* at 20. Appellant emphasizes his own consistent testimony. *Id.* at 20-21.

As this Court has explained,

_____

[8] Appellant also argues that the Commonwealth's delay in case number 203 of 2024 should be subtracted from the adjusted run date in the instant case. Appellant appears to argue that the Commonwealth's lack of diligence in an unrelated case must be extended to a different prosecution involving the same defendant. Appellant cites no authority to support this proposition, and we decline to extend Rule 600 to allow for consideration of delays in an unrelated criminal prosecution involving the same defendant.

[a] verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. It is well established that a weight of the evidence claim is addressed to the discretion of the trial court, and a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice.

In reviewing a challenge to the weight of the evidence, the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. Appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose an abuse of discretion.

***Commonwealth v. Anderson***, 323 A.3d 744, 756-57 (Pa. 2024) (internal citations, quotation marks, and brackets omitted).

Our Supreme Court has explained that

"[i]sues of witness credibility include questions of inconsistent testimony and improper motive." ***Commonwealth v. Sanchez***, … 36 A.3d 24, 27 (Pa. 2011) (citation omitted). A jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit. ***See Commonwealth v. Rivera***, … 983 A.2d 1211, 1220 (Pa. 2009) (stating that "the trier of fact, in passing upon the credibility of witnesses, is free to believe all, part, or none of the evidence") (citation omitted).

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1080 (Pa. 2017).

Instantly, as described above, Mr. Williams consistently testified that Appellant sold the van to Hoyle's without his permission. Although Mr. Williams offered contradictory testimony several times, he consistently testified that Appellant did not have his permission to sell the van. The jury,

as fact finder, chose to believe Mr. Williams. We decline Appellant's invitation to act as fact-finder, reweigh the evidence, and disturb credibility findings based on a cold record. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1288-89 (Pa. Super. 2021) ("it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded [] evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record." (citations omitted)). Because we discern no abuse of the trial court's discretion in rejecting Appellant's weight challenge, Appellant's issue merits no relief.

Finally, Appellant challenges the discretionary aspects of his sentence. Appellant's Brief at 33. Appellant points out that at the sentencing hearing, Mr. Williams failed to appear and offered no statement for the trial court's consideration. *Id.* at 34. Appellant asserts that he "presented a number of mitigating factors[,]" including the fact that his most recent criminal conviction took place "a long time ago[,]" in 2004. *Id.* Appellant argues that since that time, "he has been an upstanding member of society with numerous individuals writing letters in support of him." *Id.* According to Appellant,

> [r]egardless of this information, [] Appellant was sentenced to a period of incarceration of not less than 21 months, nor more than 42 months. This sentence was wholly unreasonable and an abuse of discretion given the testimony provided in support of a mitigated sentence.

*Id.*

In reviewing a challenge to the trial court's sentencing discretion, we are mindful that

> [c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Manivannan*, 186 A.3d 472, 489 (Pa. Super. 2018) (quotation marks, some citations, and emphasis omitted; punctuation modified).

Appellant filed a timely post-sentence motion and notice of appeal, but failed to include in his brief the requisite Pa.R.A.P. 2119(f) statement of reasons for allowance of appeal. Rule 2119(f) requires the appellant to "set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence." Pa.R.A.P. 2119(f). Nevertheless, the Commonwealth, by filing no appellate brief, lodged no objection to Appellant's failure to provide a Rule 2119(f) statement. "Since the requirement of such a statement is procedural and not jurisdictional, the Commonwealth's failure to object to or otherwise assert the defect in the form of [a]ppellant's brief has resulted in a waiver of the defect." *Commonwealth v. Patterson*, 180 A.3d 1217, 1232 (Pa. Super. 2018) (citation omitted).

We next must determine whether Appellant's challenge to the discretionary aspects of his sentence raises a substantial question for our review.

> In order to establish a substantial question, the appellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. The determination of whether a particular case raises a substantial question is to be evaluated on a case-by-case basis.

*Commonwealth v. Bonner*, 135 A.3d 592, 603 (Pa. Super. 2016) (citations and quotation marks omitted). Further, this Court has held that "a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Commonwealth v. Dortch*, 343 A.3d 298, 310 (Pa. Super. 2025) (quoting *Commonwealth v. Crawford*, 257 A.3d 75, 79 (Pa. Super. 2021)).

Here, Appellant claims the trial court failed to consider mitigating factors. Thus, Appellant has not raised a substantial question for our review. *Id.* We additionally observe the following.

Where a sentencing court is informed by a pre-sentence investigation report (PSI), "it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Edwards*, 194 A.3d 625, 638 (Pa. Super. 2018) (citation omitted and formatting altered). Further, "where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under

the Sentencing Code." ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super. 2010) (citation omitted).

Instantly, the trial court sentenced Appellant within the standard range of the sentencing guidelines. N.T., 4/14/25, at 16-19. The trial court additionally had the benefit of a PSI. ***Id.*** at 6. Thus, we discern no abuse of the trial court's discretion in sentencing Appellant. Appellant's final claim warrants no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/8/2026